**UNITED STATES of America**

v.

**STATE OF TEXAS, Texas Education Agency, Dr. J. W. Edgar, Commissioner of Education, Cason Independent School District, et al.**

**Civ. A. No. 1424.**

United States District Court,
E. D. Texas,
Marshall Division.

Nov. 24, 1970.

Roby Hadden, U. S. Atty., Tyler, Tex., David Vanderhoof, Dept. of Justice, Civil Rights Div., Washington, D. C., Alexandra Polyzoides, Atty., Dept. of Health, Education and Welfare, Washington, D. C., for plaintiff.

Crawford C. Martin, Atty. Gen., James C. McCoy and Pat Bailey, Asst. Attys. Gen., Austin, Tex., Henry Harbour, Longview, Tex., Harold Nix, Daingerfield, Tex., Hugh D. Reid, Jr., Fairfield, Tex., J. B. Sallas, Crockett, Tex., for defendants.

## MEMORANDUM OPINION

JUSTICE, District Judge..

### [Procedural Background]

The original complaint in this action was filed on March 6, 1970. On June 26, 1970, an amended complaint was filed joining additional defendants. The matter came to trial in Marshall, Texas, on September 14, 1970.

### [Summary of Facts]

The complaint in this action charges the defendants with acts and practices which have denied black children equal educational opportunities in violation of Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment to the United States Constitution. The allegations are based particularly on actions in connection with the creation and continued maintenance of nine all-black school districts.[1] It is charged that the defendants have engaged in direct actions, or, alternatively, have failed to act in a manner authorized under Texas law, so as to assure all children in the State of Texas equal educational opportunities. Further, it is alleged that the State of Texas, through the Texas Education Agency, has failed, as the chief supervisory body of public education in Texas and as disbursor of State educational assistance, adequately to oversee and supervise the districts within the State so that no child is denied on the ground of race the benefits of programs supported by Federal funds.

Since the filing of the amended complaint, a number of actions have been taken by defendant county boards of edu-

---

1. Butler Independent School District; Cason Independent School District; Jeddo Common School District; St. Paul Common School District; St. Paul-Shiloh Common School District; Trahin Common School District; Vernon County Line Common School District; Washington Common School District; and Whiterock Common School District.

cation which have resulted in the elimination of the all-black districts within their jurisdictions.[2] These actions were taken voluntarily by the county and local officials and have been acknowledged by the State Agency. The evidence in this case related to the factual situation prior to the filing of the amended complaint. The Court has, however, had no opportunity to evaluate the results of the actions with respect to the allegations in the complaint and is without sufficient information or educational expertise to determine whether these voluntary consolidation actions in fact constitute adequate and appropriate relief for the violations charged in the complaint. This opinion is, therefore, based upon the facts which existed prior to the commencement of this action and does not take into consideration annexation or consolidation actions which were taken after that time. The Court has, of course, considered these actions in developing its order for relief.

*[Parties]*

The defendants fall into three general categories: (1) the State Agency, (2) independent school districts, and (3) county boards of education and county superintendents.

■ The Texas Education Agency (TEA) is a proper party to this action because it is charged with fulfilling the duty placed on the State by the Constitution of the State of Texas (Art. 7, § 1) to operate a system of public schools.

The complaint against TEA proceeded on the theory that present policies and practices of that Agency, including the disbursement of State and Federal Assistance in the form of both supervision and financial support, are responsible for or contribute to the operation of the all-black districts involved in this suit. In order to receive Federal financial assistance for distribution to school districts within the State, the TEA executed and filed with the Department of Health, Education and Welfare an Assurance of Compliance with Title VI of the Civil Rights Act of 1964 and pertinent HEW Regulations and Policies. This Assurance must be viewed, at the very least, as evidence that the State Agency has known and now recognizes the extent of its obligations existing under Title VI and the Fourteenth Amendment.

■ Each independent school district * is a proper party to this action, since each such unit is authorized to operate under the actual management and immediate control of its own superintendent and board of trustees. Independent school districts are under only the general supervision of the TEA, and the county boards of education and county superintendents are responsible under Texas law for supervision of independent school districts only in the area of transportation and interdistrict transfers. (See §§ 16.52(a) and 21.062(a), Texas Education Code (1969)).[3]

| 2. All-black District | County | District Receiving District (County) All-black |
|---|---|---|
| Jeddo CSD | Bastrop | Smithville ISD (Bastrop) |
| St. Paul CSD | Henderson | Malakoff ISD (Henderson) |
| Trahin CSD | Freestone | Buffalo ISD (Leon) |
| Vernon Co. Line CSD | Jasper | Colmesneil ISD (Taylor) |
| Washington CSD | Nacogdoches | Nacogdoches ISD (Nacogdoches) |
| Whiterock CSD | Grayson | Whiterock ISD (Grayson) |

* ISD

3. In addition to the two all-black independent school districts (Cason and Butler), two predominantly white independent school districts Daingerfield and Fairfield, are also parties to this action. These districts were included because of their roles with reference to the creation and support of several of the all-black districts. Further, the county boards of

■ With respect to the common school districts ** concerned herein, the respective county boards of education and county superintendents of the counties in which they are situated, rather than the officials of the individual common school district, were correctly made parties to the suit. Under Texas law, the "County superintendent [has] under direction of the commissioner of education, the immediate supervision of all matters pertaining to public education in his county," and the individual boards of trustees of common school districts are authorized to act only subject to the supervision of the county officials. (See § 17.59(a), Texas Education Code (1969)).

*[Historical Background]*

Prior to 1954, the State of Texas operated separate schools for white and black children pursuant to the State Constitution and statutes. The result was commonly the so-called dual school districts. The necessity for separate education,[4] enhanced by the sparce settlement of many rural areas in the State, also led to the establishment of school district lines enclosing single schools established to serve small communities, often consisting only of members of one race.[5] By 1969, many of these small districts had been consolidated into neighboring districts of greater size un-

der provisions of Texas law.[6] (See Vernon's Revised Civil Statutes, § 2742f). This law required, *inter alia*, that in order for a district to be consolidated or for a portion of a district to be annexed to another district, it would be necessary to secure the approval of the majority of the voters residing in the area affected.

Under section 19.001 of the new Texas Education Code which became effective on September 1, 1969, the State legislature provided a further means for eliminating small, uneconomical, and, indeed, racially segregated school districts. This section of the Code states that the county board of education may enlarge the territory of any school district within its jurisdiction having more than 150 students (more than 400 in the case of a common rather than an independent school district) by annexing to it any adjoining district having fewer than 250 students. The Statute requires no petition by the district's residents and no vote of approval to effect such action, but merely the action of the county board.

The State has further demonstrated its interest in assisting in the reduction of the number of small and uneconomical districts by implementation of a program of incentive aid. (Vernon's Revised Civil Statutes § 2815–4). This program is designed to encourage districts to con-

---

education for the counties in which all independent districts lie are proper parties because of their participation in certain land transfers affecting the boundary lines and the racial composition of the enrollment of the independent districts.

** CSD

4. Art. 7, § 7 of the Texas Constitution provides, "Separate schools shall be provided for the white and colored children, and impartial provision shall be made for both."

5. These circumstances may have been reinforced by the presence on the State statute books of a law under which no school authority could abolish a dual school system or abolish arrangements to allow minority students to transfer out of a district without a vote of the quali-

fied electors living in the district. (Section 2900a, Vernon's Civil Statutes). Subsection.4 of the Statute provided that a district violating the above provision would be ineligible for accreditation and ineligible for State financial assistance under the Minimum Foundation Program. Finally, in addition to the sanctions against the district, the Statute provided that any person violating the provisions would be guilty of a misdemeanor and subject to a fine of $100 to $1000.

This statute was declared unconstitutional in Boson v. Rippy, 285 F.2d 43 (5 Cir. 1960). Op.Att'y General, 1962. N.WW–1490.

6. In 1948, the State of Texas included some 5,000 school districts. That number has now been reduced to under 1,200.

solidate by allowing the newly formed unit to receive, subject to certain statutory restrictions, State assistance equivalent to the total amount which would have been received by each of the former districts rather than determining State aid on the basis of the combined enrollment.

The formula for state aid under the Minimum Foundation Program is designed to favor small districts. Therefore, when a small district is enlarged through the annexation to it of a neighboring unit the newly enlarged district would be entitled to use a base for calculating its Minimum Foundation formula allotment that would be less favorable than would be the case if both former districts were counted separately and the two formula allotments combined.

[*Factual Background Concerning School Districts*]

Each defendant described above is, to some degree, responsible for the creation or administration of one or more of the nine all-black school districts whose continued existence is at issue in this case. Appendix A to this opinion provides a list of these defendants, indicating for each its appropriate all-black companion district or districts. In addition to the general administration of the all-black districts, the defendants have arranged for, approved or acquiesced in an assortment of detachments and annexations of territory and student transfer and transportation arrangements which have had the effect of transferring students between administrative units so as to create and perpetuate all-black districts.

Prior to the commencement of this action, the defendant county boards of education had, in each instance, denied, avoided, or failed to consider or order the consolidation of these all-black and educationally inferior districts into adjacent units under their jurisdiction. The defendant State Agency has, in each instance, financed, provided textbooks for, accredited, and otherwise assisted in the operation of the all-black districts. Finally, the State has approved the detachments and annexations of territory and the interdistrict transfers of students, and has demonstrated its approval by financing the newly created units and "receiving" districts. In this regard, the State Agency has made no attempt to exercise a supervising function to see that no agency of the State pursues actions and practices which contravene the requirements of Title VI and the Fourteenth Amendment.

Under Texas law, as already shown, the officials of the all-black common school districts may act only subject to approval by their county boards of education and county superintendents. All except three of the all-black districts have fewer than 100 students.[7] Each district, when measured against its contiguous districts, displays inferior educational facilities and personnel.[8] Their curricula are for the most part severely limited—indeed, of the nine all-black districts, including both independent and common, only three of the largest, Butler ISD, St. Paul CSD, and St. Paul-Shiloh CSD, are accredited by TEA. In most cases, the libraries in the all-black districts contain fewer volumes than do similar libraries in the adjacent districts, the sanitary facilities at the all-black schools are primitive, and, with the exception of audiovisual equipment financed by the Federal Government under Title I of the Elementary and Secondary Education Act,

7. The two independent all-black districts, Butler ISD and Cason ISD, each have a total enrollment of approximately 240 black students. St. Paul CSD has a total enrollment of about 200.

8. The St. Paul CSD is somewhat unique in that it has been operated in conjunction with a private charitable organization which has donated several excellent buildings for the use of the school. The district in turn has educated children living on the campus in dormitories financed by the charitable organization. All but three of its students are black and are so-called "problem" children from northern and eastern Texas. The remaining three are Mexican-American.

their special equipment and facilities are substandard and inferior.[9]

In addition to the problems discussed above with respect to the inferior educational facilities and programs offered in the all-black districts, State, county and local officials have participated in many instances in affirmative actions which have reinforced the inequalities of the black districts.

[*Boundary Changes and Student Transfers*]

Several of the school districts involved in this suit have experienced boundary changes and have experienced increases or decreases in their student enrollment because of interdistrict student transfers. The following districts have experienced boundary changes, due to the annexation or detachment (or both) of portions of their territory, which resulted in the removal of all, or virtually all, white children from the now all-black districts and the siphoning off of black students from neighboring districts with bi-racial enrollments:

*Vernon County Line Common School District.* In 1948 two small areas containing only white children were detached from the Vernon County Line District. One of these areas was annexed to the Colmsneil Independent School District, and the other was annexed to the Jasper Independent School District. A third portion of territory containing only black students was detached from the Colmsneil District and annexed to Vernon County Line District.

*Cason Independent School District.* In 1951, the former Sycamore Common School District ceased to operate, and its territory was divided between the Cason and Daingerfield Independent School Districts. Although Cason oper-

ated both a black school and a white school at the time, all white students from Sycamore were given to Daingerfield, while most of the black students were allotted to Cason. In 1968, an irregularly shaped piece of territory belonging to the Cason Independent School District was detached from Cason and annexed to the Daingerfield Independent School District. This land transfer resulted both in the removal of white students from Cason as well as in the division of Cason into two non-contiguous areas separated from each other by the detached territory.

*Butler Independent School District.* In 1964, two irregularly shaped territories were exchanged between the Butler and Fairfield Independent School Districts. The portion of territory transferred from Butler to Fairfield contained only white children and included students who lived at the Daniel Memorial Orphans Home located in the midst of the Butler District. In order to arrange the annexation of the traditionally all-white orphanage to the Fairfield District, which was not contiguous to the orphanage grounds, the school districts and county board of education approved inclusion of the right-of-way of the highway leading from the orphanage into the Fairfield District in the area to be detached. The area of land transferred to Butler from Fairfield contained only black children.

The school districts involved in this suit exhibit a pattern of student transfers which may be categorized as follows:

(1) Black students transferring out of districts with bi-racial enrollment into predominantly or totally black districts.[10]

(2) White students transferring out of predominantly black districts into predominantly or totally white districts.[11]

9. See Government's Exhibits: 11, 21, 51, 31, 51, 61, 71, 81 and 91.

10. *E. g.* During the 1969–70 school year, approximately 21 black students transferred from Sherman Independent School District, whose enrollment included both white and black students, to attend school

in Whiterock Common School District, which was all-black.

11. During the 1969–70 school year, *e. g.,* approximately 12 white students transferred from St. Paul CSD to Malakoff ISD.

(3) Students of all races transferring out of their home districts to attend grades not offered there.[12]

Under Texas law, student transfers such as those described above must be approved by the county superintendent having jurisdiction over the receiving district. Where transfer requests are made prior to June 1, the students' parents submit a request to the receiving district's superintendent and are required to give no reason for their desire to have their child leave the home district. If the request is granted, the student's attendance record for the previous year (assuming this is the first year of transfer) is transferred by TEA to the receiving district. This transaction enables the receiving district to benefit from increased pupil attendance in the form of an immediate increase of Minimum Foundation funds.[13] Although no reasons for transfer must be given on a request addressed to a receiving superintendent and made prior to June 1, any request made after that date must be submitted along with a justification for a so-called "hardship" transfer.

In addition to the general pattern of transfers discussed above, an apparently unique situation occurred during the 1969–70 school year involving Jeddo CSD, an all-black district, and Smithville ISD. The record shows that three black students transferred from the Smithville ISD into the Jeddo CSD for the 1969–70 school year. The record shows further that but for these three transfer students, the Jeddo District's Average Daily Attendance (ADA) would have fallen below fifteen, which is the minimum ADA set by the State to qualify a school district to receive a salary allotment for one

teacher.[14] With less than fifteen pupils, the Jeddo District would have had to close or operate without State aid. It was only by virtue of the transfer arrangement, made with the approval of the defendant County Superintendent of Bastrop County, and the financial assistance rendered by TEA upon its receipt of notice of the transfers, that this small, uneconomical, all-black district continued to exist.

*[Applicable law]*

██ Separate neighboring or overlapping school districts, one black and the other white, are unconstitutional when created and maintained to perpetuate a dual school system, and such districts require consolidation with nearby units so as to assure their students equal educational opportunities. Haney v. County Board of Education of Sevier County, Arkansas, 410 F.2d 920 (8th Cir. 1969); United States v. Bright Star School District #6, No. T–69–C–24 (W.D.Ark. April 15, 1970). Turner v. Warren County Board of Education, 313 F. Supp. 380 (E.D.N.C.1970), on appeal sub nom. Turner v. Littleton-Lake Gaston School District, C.A. No. 14990 (4th Cir.).

As noted above, Texas schools were segregated by law prior to 1954. This enforced segregation resulted in dual school systems within districts, as well as in the establishment of district lines which enclosed small communities often consisting only of members of one race. The existence of small districts with enrollments under 250 have not resulted solely from the legal requirement of segregation. By isolating racially homogeneous residential areas into formal

---

12. During the 1969–70 school year, all students living in the Jeddo CSD and wishing to attend high school transferred to Smithville ISD, because the Jeddo district offered only grades 1–8.

13. Minimum Foundation Program assistance from the State is normally based upon the prior year's average daily attendance (ADA) in the district. Therefore, the impact of student transfers is to

increase the receiving district's ADA and, thereby, to increase the base upon which that district's State assistance is computed.

14. Any district whose ADA falls below 15 is required to operate without the benefit of State funds except in cases of severe hardship. Texas Education Code § 16.13 (1969).

political enclaves, district lines drawn prior to 1954 have entrenched segregation and insured its continuation after its legal basis was declared unconstitutional.

The same factors which were found to exist in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and which led the Supreme Court to hold that separate education was "inherently unequal," exhibit themselves in the "separate" districts, and, similarly, have rendered these segregated districts "inherently unequal." Turner v. Warren County Board of Education, *supra*. Moreover, actions of the State and its county and local educational agencies, such as financing, provision of textbooks and other materials, accreditation, and approval of transfers both of students and of territory, have augmented the inequalities between the small, all-black districts and their neighbors.

Such action was ruled unconstitutional by the Supreme Court in Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5, 19 (1958) where the Court stated:

The command of the Fourteenth Amendment is that no "State" shall deny to any person within its jurisdiction the equal protection of the laws. "A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, * * * denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning." [Citation omitted]. Thus the prohibitions of the Fourteenth Amendment extend to all action of the State denying equal protection of the laws; whatever the agency of the State taking the action, [Citations omitted] or whatever the guise in which it is taken, [citations omitted]. In short, the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the *Brown* case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted "ingeniously or ingenuously." [Citation omitted]. At 16–17, 78 S.Ct. at 1409.

Similarly, the District Court declared in Bush v. Orleans Parish School Board, 190 F.Supp. 861 (E.D.La.1960) (3-judge court), aff'd sub nom. City of New Orleans v. Bush, 366 U.S. 212, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961):

That the enjoyment of this constitutional right cannot be denied or abridged by the state, and that every law or resolution of the legislature, every act of the executive, and every decree of the state courts, which, no matter how innocent on its face, seeks to subvert the enjoyment of this right, whether directly through interposition schemes, or indirectly through measures designed to circumvent the orders of the courts of the United States issued in protection of the right, are unconstitutional and null. 190 F.Supp. at 864.

■ The exercise of a power which normally lies wholly within the domain of state interest so as to circumvent a federally protected right is unconstitutional. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). The *Gomillion* case is closely analogous to the situation presented here. In *Gomillion*, the Alabama State Legislature had exercised its power to redefine the boundaries of the City of Tuskegee. The effect of the action was to remove all or virtually all black voters from the city and thereby to eliminate them from participating in municipal elections. The

**1052**

Supreme Court, in an opinion written by Justice Frankfurter, held as follows:

> A statute which is alleged to have worked unconstitutional deprivations of petitioners' rights is not immune to attack simply because the mechanism employed by the legislature is a redefinition of municipal boundaries. At 347, 81 S.Ct. at 130.

Thus, the Supreme Court instructed the lower court to proceed on the theory that the creation of a municipal unit was of secondary importance to the preservation of the constitutional right to vote.

■ Similarly, in the case at bar, the State of Texas has created, and has participated in the continued support of administrative units which were created under color of a State law requiring separate educational facilities or, at the least, were formed without regard to Constitutional standards of equality. The effect of the continued operation of these administrative units, to paraphrase Mr. Justice Frankfurter, has "worked unconstitutional deprivations" of the rights of black children. Under the *Gomillion* holding, the creation, maintenance and perpetuation of racially discriminatory district lines—whether for the purpose of elections or school attendance—is constitutionally improper.

■ The application of the *Gomillion* principle to the case at bar receives additional support from the last paragraph of the Supreme Court's opinion which states:

> When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right * * * "Acts generally lawful may become unlawful when done to accomplish an unlawful end, United States v. Reading Co., 226 U.S. 324, 357, 33 S.Ct. 90, 57 L.Ed. 243, and a constitutional power cannot be used by way of condition to obtain an unconstitutional result." Western Union Telegraph Co. v. Foster, 247 U.S. 105, 114, 38 S.Ct. 438,

439, 62 L.Ed. 1006. At 347–348, 81 S.Ct. at 130.

Thus, while the State of Texas is generally free to create and support administrative or political districts within its boundaries, when exercise of those lawful powers results in the abridgement of constitutional rights, that exercise will not be permitted.

■ It cannot be disputed that the defendants here are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board of New Kent County, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). Fulfillment of that responsibility can no more be defeated by the maintenance of separate educational units which perpetuate segregation than it can by the maintenance of attendance zone lines drawn to perpetuate racial segregation within single school districts. See Youngblood v. Board of Public Instruction of Bay County, 430 F.2d 625 (5th Cir. July 24, 1970), and cases cited therein.

Accordingly, Federal courts have nullified proposed or existing school districts whose boundary lines impede desegregation and interfere with constitutional plans to that end, and, in those cases concerning existing school districts, the courts have required consolidation of such units with one or more adjacent school districts to overcome the constitutional infirmity. Haney v. County Board of Education of Sevier County, Arkansas, supra; United States v. Bright Star School District #6, supra; Turner v. Warren County Board of Education, supra; Wright v. County School Board of Greensville County, Virginia, 309 F.Supp. 671 (E.D.Va.1970) on appeal sub nom. Wright v. Council of City of Emporia, No. 14552 (4th Cir.); Burleson v. County Board of Election Commissioners of Jefferson County, 308 F.Supp. 352 (E.D.Ark.1970); United States v. Halifax County Board of Education, 314 F.Supp. 65 (E.D.N.C. May

23, 1970), on appeal sub nom. United States v. Scotland Neck City Board of Education, No. 14929 (4th Cir.).

The *Haney* case involved a reorganization, pursuant to Arkansas law, of school districts within Sevier County, which had resulted in the creation of two all-black districts operated under one administrative unit and separated from each other by an all-white district. The plaintiffs charged the County Board with operation of a dual school system, but were denied relief by the district court on the grounds that since the all-black school and all-white school in question were located in separate districts, and since no purposeful gerrymander of boundaries had been shown, the schools could not be termed "segregated".

The Circuit Court rejected this position and reversed, saying:

It is true Arkansas law did not require school *districts* to be separated by race. But the fact that the various reorganized districts in Sevier County reflect a bi-racial system of education by district lines must be accepted as more than mere coincidence. It is readily apparent that the Sevier County Board of Education approved reorganization of districts along district lines which facilitated the segregated system of public education then required by Arkansas law. It would be sheer fantasy to say that the school district in Sevier County could be realigned today in the same manner that they were in 1948 and still comply with the constitutional mandate of *Brown I* and *II*. School district reorganization took place under the color of state law that then required segregated schools.

Under these circumstances, when the resulting district lines drawn reflect a discriminatory pattern, *de jure* segregation is established. Simply to say there was no intentional gerrymandering of district lines for racial reasons is not enough. As Mr. Justice Harlan once observed, "[T]he object or purpose of legislation is to be determined by its natural and reasonable effect, whatever may have been the motives upon which legislators acted." [Citations omitted].

\* \* \* \* \* \*

If segregation in public schools could be justified simply because of pre-*Brown* geographic structuring of school districts, the equal protection clause would have little meaning. Such a position "would allow a state to evade its constitutional responsibility by carve-outs of small units." [Citations omitted]. More ingenious methods have been tried and have failed. 410 F.2d at 924.

The Court concluded, stating:

We find as a matter of law that the school district lines of Sevier County were created to reflect racial separation by schools \* \* \* Based upon the finding that these districts were originally segregated under color of existing state law, the defendants here are charged with the affirmative duty fully and effectively to integrate their school facilities. [Citations omitted]. At 926.

More recently, and at the district court level, the question of segregated districts arose in the *Turner* case, which involved the division of a county-wide school district into three administrative units. One city unit, Warrenton City, had an enrollment of 206 resident students, 69% of whom were white. The other city unit, Littleton-Lake Gaston, has a resident student enrollment of 659, 46% of whom were white. The county unit was predominantly black. Students were permitted to transfer between units, and, as a result, a substantial number of white students transferred from the county unit to the two city units, while a substantial number of black students transferred from the cities into the county. The Court projected that, but for the restraining order, the Warrenton city unit would have been approximately 94% white, the Littleton-Lake Gaston city unit would have been about 54% white, and the remainder of the county about 93% black.

The plaintiffs in *Turner* alleged that the actions of the State and county were

in violation of the Fourteenth Amendment saying that "the purpose and effect of the local Act is to 'perpetuate the racial dual school system in Warren County by removing substantial numbers of white students from the County School System.'"

The Court held for the plaintiffs, saying:

Since the cases of Brown v. Board of Education, [citations omitted] decided approximately fifteen years ago, the Warren County Board of Education has been under the continuous affirmative duty under the Fourteenth Amendment to devote every effort toward disestablishing the dual school system then existing in Warren County.

In Green v. County School Board of New Kent County, [citations omitted] the Court said:

15. The 1948 study of Education in North Carolina, 397–401, conducted by the State Education Commission, contains the following pertinent recommendations:

"Since a local administrative unit should be sufficiently large enough to warrant the provision of all essential administrative and supervisory services, local units of school administration which are established in the future should be organized so as to assure the unit an absolute minimum of 3,500 to 4,000 school population and desirable minimum of 9,000 to 10,000 school population."
The 1968 Report of the Governor's Study Commission on the Public School System of North Carolina, 29, 167, states:
"(T)he movement has been toward the consolidation of smaller schools and a trend toward the establishment of large administrative units.

\* \* \* \* \*

"So that North Carolina can provide economical and effective schools, the Commission recommends that the State adopt the county as the basic school administrative unit. Merger of city units with county units and, where necessary, merger across county lines should be accomplished, in order to achieve sound educational programs."
See similar language from Volume IV of the Report of the Governor's Committee on Public School Education in Texas, which states, at page 13:

"School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever step might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." 313 F.Supp. at 381.

Then, the Court continued:

The creation of small school units in Warren County cannot be rationalized upon sound educational grounds. For many years educators have advocated the consolidation of schools, and the merging of county and school units whenever feasible, to provide larger schools with a more comprehensive curricula, and at greater economy in per pupil cost.[15] At 384.

The situation in the case at bar appears analogous, on a state-wide basis, to the circumstances presented in the

"To offer a comprehensive program, a school district must either be large enough to have classes of reasonable size in a variety of subjects, or it must operate with very small classes at a very high cost per student. As adopted, the the Texas Minimum Foundation Program underwrites an unhappy compromise between these two alternatives. Small districts are granted more favorable personnel ratios and higher operating allotments but they still have narrow programs. The Gilmer-Aiken Committee estimated that reorganization would save $10 million a year in 1949 under the Foundation Program. The saving would be more than twice that amount now."
That particular section of the Committee Report concludes with the following observations:

"The Governor's Committee recognized that the local high school may be the mainstay of some small communities, but it has concluded that no child should be deprived of educational opportunities fitted to his needs. The establishment of strong local units which are competent to provide comprehensive programs is the best guarantee of continued local control of educational policy. The Committee also is convinced that no district shall be allowed to offer inferior educational opportunities to children who will soon be citizens of a distant city."

*Haney* and *Turner* cases. Here, too, there are all-black school districts which were created under color of State law prior to 1954, or without regard to Federal law after that date. Here, too, pursuant to State law and the implementing policies of TEA, students may transfer freely between school districts.[16] The effect of this free transfer policy has been to create and maintain all-black school districts and to offer students an escape from school districts undergoing the process of desegregation.

A similar question arose in Burleson v. County Board of Election Commissioners of Jefferson County, 308 F.Supp. 352 (E.D.Ark.1970). This case involved attempt by a small group of patrons of the Dollarway School District in Arkansas to secede or detach itself from the district and establish a separate district. The court held:

> [T]hat the secession * * * would inflict severe damage upon the district financially * * * If the District has to bear that loss it is doubtful at best that it can provide any kind of quality education for its students, or that it can operate its schools for nine months terms, or that it can maintain its present accreditation. In addition, it will find it most difficult to employ and retain in employment competent personnel particularly people who are willing to work and teach in an integrated school system.

> The court further finds that the secession, if permitted, will substantially increase the racial imbalance in the District's student bodies.

> * * * * * *

Considering together the financial impact of the secession and the increased racial imbalance resulting therefrom, it is fairly inferable that there will be some exodus from the District's schools of white students not residing in the District, and it is possible that the entire system will become in effect an all-black system with only a token number of white students in attendance.

* * * * * *

All that the Court holds is that as of this time and in the existing circumstances the proposed secession cannot be permitted and will be enjoined. At 356–357.

See also Wright v. County School Board of Greenville County, Virginia, *supra*.

## [Relief]

This Court has jurisdiction of this matter as a case in equity and derives from this jurisdiction broad powers to fashion appropriate relief based upon the particularized knowledge and understanding that have been gained as a result of the court's close relationship with the facts of the case. National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941). See also Mitchell v. Robert De Mario Jewelry, Inc., 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). The Supreme Court specifically directed lower tribunals to exercise such powers of equity in matters involving school desegregation, in its decision in Brown v. Board of Education, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (*Brown II*), when it stated:

> In fashioning and effectuating the decree, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its rem-

16. Mr. Gilbert Conoley, Program Director for the Title IV Technical Assistance Program, TEA, during his deposition dated August 19, 1970, stated that the freedom of choice transfer policy between schools within a particular school district was similar to the free transfer policy between school districts. (See pages 54–63). With reference to the transfer of white students out of the Jackson Common School District which resulted in maintaining Jackson as an all-black district, and with reference to the resulting impact of these transfers on Jackson's compliance status with respect to the Civil Rights Act of 1964, Mr. Conoley stated: "In my opinion, it [the transfer arrangement] was nothing more than defiance of ever coming in compliance." (Page 57.)

edies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the validity of these constitutional principles cannot be allowed to yield simply because of disagreement with them.

 The Order in this case may be divided into two parts. The first part requires the defendant school district, county boards of education and their respective officials to collaborate with the defendant TEA and the United States Office of Education in the preparation of plans to insure that no child will be effectively denied equal educational opportunities on account of race, color or national origin, and that the school districts and county boards of education involved will be operating in compliance with Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment.

TEA and the Office of Education are required to consider the reorganization of each of the all-black school districts in issue here with one or more nearby school districts to insure equal educational opportunity for all students involved. In *Brown II*, the Supreme Court gave specific authority for such relief, stating at 300–301, 75 S.Ct. at 756:

\* \* \* [T]he courts may consider problems related to administration, arising from the physical condition of the school plant, the school transpor-

tation system, personnel, *revision of school districts* and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. [Emphasis added].

In the cases involving districts which have ceased to exist by virtue of voluntary actions taken subsequent to the filing of this lawsuit, the task of TEA and the Office of Education will be to review these actions to ascertain whether they will accomplish the basic purpose of the Order and to determine whether in the carrying out of these actions the county and local authorities have followed the mandates of the Federal Courts, specifically those of the Supreme Court and the Court of Appeals for the Fifth Circuit with respect to faculty and staff desegregation as well as the nondiscriminatory assignment of students to schools and classes. Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969).

 The second part of the Order is directed primarily at the Texas Education Agency as the chief supervisory body of public elementary and secondary education in Texas and as initial recipient and distributor of Federal financial assistance to school districts throughout the State.

The State is obligated to oversee the actions of its agencies to insure against violations of the constitutional rights of individuals.[17] United States v. State of Georgia, C.A. No. 19972 (N.D.Ga. Dec. 15, 1969). Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment impose upon the State of Texas an obligation to insure that the actions of its agencies do not deprive any person

17. TEA Statement of Compliance (Government Exhibit 100B) and United States

by Clark v. Frazer, 297 F.Supp. 319 (M.D.Ala.1968).

of equal protection of the law.[18] When evidence shows that these constitutionally guaranteed rights are being denied or abridged under color of state law and that children are being denied equal educational opportunities with the approval, acquiescence or direct support of a state agency, it is the affirmative duty of that state to take "whatever step might be necessary to * * * [eliminate] racial discrimination * * * root and branch." Green v. County School Board of New Kent County, *supra;* United States v. State of Georgia, *supra;* Griffin v. State Board of Education, 296 F.Supp. 1178 (D.C.Va.1969) (3-judge court). It is appropriate that the court place full responsibility for obtaining school desegregation in compliance with constitutional requirements on the state agency. As the court stated in Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967) (3-judge court), aff'd sub nom. Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967);

> This Court can conceive of no other effective way to give the plaintiffs the relief to which they are entitled under the evidence in this case than to enter a uniform state-wide plan for school desegregation, made applicable to each local county and city system not already under court order to desegregate and to require these defendants to implement it. Only in this way can uniform, expeditious and substantial progress be attained, and only in this

way can the defendant state officials discharge the constitutional duty that was placed upon them twelve years age in Brown v. Board of Education, supra. It cannot seriously be contended that the defendants do not have the authority and control necessary to accomplish this result. Certainly the possibility of losing state funds for failure to abide by and implement the minimum constitutional requirements for school desegregation which this opinion and the accompanying decree require will, without any doubt, effect compliance. 267 F.Supp. at 478.

The record in this case demonstrates that the policies and practices of TEA in administering the public school system in Texas have frequently—whether inadvertently or by design—encouraged or resulted in the continuation of vestiges of racially segregated public education within the State. This Court does not possess the expertise, nor has it the personnel or ready access to the pertinent data to permit it to determine the extent to which State administrative activities and policies contribute to continued maintenance of vestiges of the dual school system. The relief in this case with respect to TEA, therefore, relies basically upon the Court's use of the educational and administrative expertise of the State Agency itself. In addition, the expertise and administrative capacities of the Office of Education are to be employed to assist the court. Lee v. Macon County Board of Education, *supra;* United

---

18. In United States v. Tatum Independent School District, 306 F.Supp. 285, 288 (E.D.Tex.1969), this Court made the following Conclusions of Law:

"2. The United States is authorized to bring this action under Title VI of the Civil Rights Act of 1964, and its implementing regulations, 45 C.F.R. 80.8(a) (1969 rev.).

"3. Apart from specific statutory authorization, the United States has standing to enforce the terms and conditions upon which its money allotments are made. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed. 2d 1118 (1968); United States by

Clark v. Frazer, 297 F.Supp. 319 (M.D. Ala.1968).

"4. Title VI of the Civil Rights Act of 1964 imposes on school districts an obligation to insure the guarantee of the Fourteenth Amendment as enunciated by the Supreme Court in Green v. County School Board, etc., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and its companion cases Raney v. Board of Education of Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Board of Commissioners of City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Taylor v. Cohen, 405 F.2d 277 (4th Cir. 1968)."

States v. State of Georgia, C.A. No. 19972 (N.D.Ga. Dec. 15, 1969); United States v. Texas Education Agency, C.A. No. 5193 (E.D.Tex. Aug. 7, 1970). These practices are not novel. Since March, 1969, there has been no hesitancy on the part of Federal courts to seek the aid of the Office of Education in the drafting of school desegregation plans. Whittenberg v. Greenville County School District, 298 F.Supp. 784 (D.S.C.1969) (4-judge court).

In many matters involving segregated public schools, it is unnecessary to seek relief against a state agency, since local authorities ordinarily possess the requisite authority to eliminate segregation which is confined within the boundaries of individual school districts. The relief in this case, however, in order to prove effective, will ultimately involve the reorganization of school districts, thus altering the administrative responsibilities of the State and its agencies. In addition, because of the contribution to the continuation of vestiges of segregation made by TEA as exemplified by its support of or acquiescence in both territorial and scholastic transfers, the relief in this case must also involve the general administration of public education by the State Agency and its use of its power to compel compliance with Federal law at all levels of the public educational system. Thus, the second part of the Order in this case allocates the primary responsibility for re-evaluation of the State Agency's programs and their administration to TEA itself on the ground that such involvement of the State Agency is fully consistent with its affirmative duty under Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment to insure that no student in Texas will be effectively excluded from equal educational opportunities based on race, color or national origin and that the dual school system heretofore maintained will be eliminated root and branch. Brown v. Board of Education (*Brown I*), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Brown v. Board of Education (*Brown II*), 349 U.S. 294, 75 S.Ct. 753,

99 L.Ed. 1083 (1955); Green v. County School Board of New Kent County, *supra;* Alexander v. Holmes County Board of Education, *supra;* Singleton v. Jackson Municipal Separate School District, *supra.*

Further, not only will the State Agency be required by the order in this case to re-evaluate and scrutinize its policies and practices, but it will be required to submit to this Court a plan developed in light of the analysis of its activities which will adequately assure the Court that the State is prepared to assume an affirmative role in the enforcement of Federal standards as required under Title VI and the Fourteenth Amendment and as acknowledged by TEA by its execution and submission to HEW of its statement of compliance. This plan will include provisions for the use by the Agency of sanctions, such as denial or withdrawal or accreditation (see Vernon's Revised Civil Statutes, § 2900a and TEA Bulletin 560, "Principals and Standards of Accreditation," Government Exhibit 106C), denial of State and Federal funds (United States v. State of Georgia, *supra*), refusal to approve the transfer of State funds based on student interdistrict transfers, and refusal to grant textbooks to an offending district.

It is hoped that the full implementation of the Order in this case and its consistent enforcement through the years will result in an end to Federal intrusion into what should rightfully be a State function—that is, the task of providing quality public education on an equal basis to all residents of that state. The assumption by TEA of the responsibility, incumbent upon it as the principal agency of the State of Texas in the field of education, to enforce throughout the system under its supervision and control the standards set by the Constitution of the United States and by Federal statutes will strengthen the State in the performance of its functions and will give new meaning to the concept of a federal system of government. Only in a system where the states can function in cooperation with the central govern-

ment to achieve compliance with the Supreme Law of the Land will there exist a strong nation, "indivisible, with liberty and justice for all."

## ORDER

On September 14, 1970, a trial was held in this matter. After having considered the pleadings and the evidence, it is hereby ordered that:

### PART I

#### A.

The defendant school districts, their superintendents, the county boards of education, and county superintendents collaborate with the defendant Texas Education Agency and the Office of Education of the Department of Health, Education and Welfare in the preparation of desegregation plans which shall insure that no child will be effectively denied equal educational opportunities on account of race, color or national origin and will result in compliance with Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment to the Constitution of the United States.

#### B.

With respect to the preparation of desegregation plans for Bulter Independent School District, Cason Independent School District, and the St. Paul-Shiloh Common School District, the Texas Education Agency and the Office of Education of the Department of Health, Education and Welfare are directed to consider the reorganization of each of these all-black school districts with one or more nearby school districts. In developing these plans, the review team is to consult with the county superintendents for the counties in which these school districts are located and the superintendents of nearby school districts and to consider all information necessary for the full preparation of such plans, including, but not limited to, bus route maps, pupil locater maps and school capacities and enrollments.

#### C.

With respect to the Jeddo Common School District, the St. Paul Common School District, the Vernon County Line Common School District, the Washington Common School District, the White Rock Common School District and the Trahin Common School District, the Texas Education Agency and the Office of Education of the Department of Health, Education and Welfare are directed to review the actions taken by the respective county boards of education in annexing such districts to contiguous school districts, to determine whether those actions will accomplish the basic purpose of this Order, as set out in paragraph A of this Part.

#### D.

In developing and reviewing these plans for the conversion of racially segregated school systems to unitary nondiscriminatory school systems, the following factors shall be considered and included:

(1) the nondiscriminatory assignment of students to schools and classes;

(2) the creation of bi-racial committees; and

(3) the nondiscriminatory hiring, assignment, promotion, demotion or dismissal of any faculty or other professional staff members in the newly organized school districts.

#### E.

The plans which are developed shall be filed with the Court on or before the 15th day of December, 1970. The Texas Education Agency and Office of Education of the Department of Health, Education and Welfare shall file with the Court by the same date reports pertaining to their review of those districts which had implemented a plan of consolidation prior to the entry of this Order.

#### F.

Any of the parties may file objections or responses to the plans and reports

within ten days after the 15th day of December, 1970. This court will thereafter hold such hearings as may be necessary.

## PART II

It is further ordered that:

### A.

The defendants, Texas Education Agency, Dr. J. W. Edgar, Commissioner of Education of the State of Texas, their officers, agents, employees, successors, and all persons in active concord or participation with them, are enjoined from permitting, engaging in, giving consent and approval to, or supporting any policy or practice which tends to maintain or re-create the dual system in the state of Texas. Specifically, the defendants named in this Part are enjoined from permitting, approving or supporting by any means:

(1) The inter-district transfer of students within the state of Texas which will reduce or impede desegregation or which will reinforce, renew or encourage the continuation of acts and practices resulting in discriminatory treatment of students on the ground of race, color, or national origin;

(2) The formation, establishment, groupment, rearrangement, consolidation, re-classification, abolition, subdivision, combination, alteration, or change (including, but not limited to the transfer, attachment, or detachment of land or territory) of any school district or districts or parts of district, in the state of Texas, which will reduce or impede desegregation or which will reinforce, renew or encourage the continuation of acts and practices resulting in discriminatory treatment of students on the ground of race, color, or national origin.

### B.

The defendant State Agency and other defendants named in this Part are or-dered to fulfill the affirmative duties placed upon them pursuant to the provisions of Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment to the Constitution of the United States. Specifically, but without limitation, it is ordered that the defendant State Agency and other defendants named in this Part, in cooperation with the Office of Education, Department of Health, Education and Welfare, shall reevaluate all of their activities and practices relating to the desegregation of public elementary and secondary education within the State of Texas, including, but not limited to students, faculty, school transportation, curriculum and extra curricular activities.

### C.

Upon completion of this re-evaluation and based upon the findings therein, and no later than January 1, 1971, it is ORDERED that the defendant Texas Education Agency and the Office of Education, Department of Health, Education and Welfare, shall file with this court a plan stating specific actions which the defendant State Agency may take pursuant to its affirmative obligations under Title VI and the Fourteenth Amendment to:

(1) Change or modify present administrative practices or policies, so as to enforce federal constitutional and statutory standards throughout the public elementary and secondary school system of the state of Texas;

(2) Employ any and all sanctions or methods of enforcement open to it to enforce federal constitutional and statutory standards with respect to any county or local educational agency or official concerned with elementary and secondary school administration in the state of Texas, such sanctions to include but not be limited to negotiations, issuance and implementation of specific enforcement policies, removal or threat of removal

of accreditation, or reduction or termination of State financial assistance;

(3) Identify any particular areas of administration by school districts or county boards of education in the state of Texas which do not appear to meet federal constitutional and statutory standards, and notify such educational agencies and their officials of their obligations to operate in a manner consistent with these standards under penalty of State enforcement proceedings; and

(4) Set up and maintain a uniform procedure within the State Agency to hear grievances and otherwise provide a forum for its enforcement actions against educational agencies and officials of the state of Texas concerning failure of such agencies and officials to comply with federal standards.

### D.

The plan referred to in Section C of this Part shall be served upon the United States in the manner provided in F(1) and (2) of this Part, and a copy of said plan shall be retained in the Offices of the Texas Education Agency in Austin, Texas, in a manner such that it will be readily and conveniently available for examination by the public during normal business hours.

### E.

On December 15, 1970, with respect to developments during the 1970–71 school year, and on November 1 of each succeeding school year, it is ordered that the defendant Texas Education Agency shall report the following information:

(1) The name of each school district within the State of Texas from which any students have transferred to another public school district, and for each such district:

a. The number of students by race and grade who transferred out of or into the district, and the district or districts to which or from which such students transferred;

b. The racial composition of the entire student bodies of the sending and receiving school districts prior to such transfers, showing the number and percentage of students by race in each school district.

(2) The name of any school district within the State of Texas which sustained any changes in its boundaries or territory, including the name of any district which was annexed or consolidated in whole or in part to any other district, or de-annexed or detached in whole or in part from any other district, and for each change in territorial responsibility:

a. The racial composition prior to each change of the student body of each school district involved, showing the number and percentage of students by race in each school district;

b. The number and race of students affected by such change and the school districts to and from which such students moved.

(3) Any changes or modifications in the administrative policies and practices of the State Agency, designed to foster desegregation or prevent discrimination based on race, color or national origin, including but not limited to the administration of the Minimum Foundation Program.

(4) Any instances in which the State Agency has identified discriminatory practices by county or local educational agencies or their officials, and for each such instance what specific steps were taken by the State Agency to enforce corrective measures on the part of those responsible for the violations.

(5) The name of each district within the State of Texas whose student enrollment is composed of more than 66% of members of a minority group

or more than 90% of the caucasian race, and as to each such district:

a. The total enrollment showing the number and percentage of students by race;

b. The total enrollment showing the number and percentage of students by race in each adjoining school district; and

c. Any changes of the boundaries or territory of the district, giving the year for each change and the approximate number of students by race who were affected by the change.

(6) Within each school district in the State of Texas the number of schools having an enrollment which is composed of more than 66% of members of a minority group or more than 90% of the caucasian race, and for each school district in which there exists one or more of such schools:

a. The district's total enrollment by race;

b. The total number of schools, showing for each school the grades taught and the racial composition, by number and percentage of students, of its student body; and

c. Any actions taken by the State Agency to assist the school districts in eliminating its racially identifiable school or schools.

## F.

It is ordered that the information to be reported pursuant to Section E of this Part shall be filed in the following manner:

(1) One copy shall be served by registered mail (return receipt requested) upon the United States Department of Justice, Civil Rights Division;

(2) One copy shall be served by registered mail (return receipt requested) upon the United States Department of Health, Education and Welfare, Office for Civil Rights; and

(3) One copy shall be retained in the offices of the Texas Education Agency in such a manner that it will be readily and conveniently available for public inspection during normal business hours.

## G.

This court retains jurisdiction for all purposes including the entry of any and all further orders which may become necessary for the purpose of enforcing or modifying this Order.

### APPENDIX A

#### BLACK AND CONTIGUOUS DISTRICTS

I. Butler I.S.D. (Freestone Co.)
 A. Fairfield I.S.D. (Freestone Co.)
 B. Trahin C.S.D. (Freestone Co.) (See VI below)
 C. Tucker I.S.D. (Anderson Co.)
 D. Oakwood I.S.D. (Leon Co.)

II. Cason I.S.D. (Morris Co.)
 A. Daingerfield I.S.D. (Morris Co.)
 B. Chapel Hill R.H.S.D. (Morris Co.)
 C. Pittsburg I.S.D. (Morris Co.)

III. Jeddo C.S.D. (Bastrop Co.)
 A. Smithville I.S.D. (Bastrop Co.)
 B. Lockhart I.S.D. (Caldwell Co.)
 C. Cistern R.H.S.D. (Fayette Co.)

IV. St. Paul C.S.D. (Henderson Co.)
 A. Eustace I.S.D. (Henderson Co.)
 B. Malakoff I.S.D. (Henderson Co.)

V. St. Paul-Shiloh C.S.D. (Leon Co.)
 A. Centerville I.S.D. (Leon Co.)
 B. Oakwood I.S.D. (Leon Co.)
 C. Grapeland I.S.D. (Houston Co.)

VI. Trahin C.S.D. (Freestone Co.)
 A. Butler I.S.D. (Freestone Co.)
 B. Dew C.S.D. (Freestone Co.)
 C. Fairfield I.S.D. (Freestone Co.)
 D. Buffalo I.S.D. (Leon Co.)
 E. Oakwood I.S.D. (Leon Co.)

VII. Vernon Co. Line C.S.D. (Jasper Co.)
 A. Jasper I.S.D. (Jasper Co.)
 B. Colmesneil I.S.D. (Tyler Co.)
 C. Zavalla I.S.D. (Angelina Co.)

VIII. Washington C.S.D. (Nacogdoches Co.)
 A. Garrison I.S.D. (Nacogdoches Co.)
 B. Martinsville I.S.D. (Nacogdoches Co.)
 C. Nacogdoches I.S.D. (Nacogdoches Co.)

IX. White Rock C.S.D. (Grayson Co.)
 A. Bells I.S.D. (Grayson Co.)
 B. Tom Dean R.H.S.D. (Grayson Co.)
 C. Whitewright I.S.D. (Grayson Co.)