**UNITED STATES of America**

v.

**STATE OF TEXAS et al.**

**Civ. A. No. 5281.**

United States District Court,
E. D. Texas,
Tyler Division.

May 11, 1971.

Roby Hadden, U. S. Atty., Tyler, Tex., Alexandra Polyzoides, Atty., Dept. of Health, Education and Welfare, Washington, D. C., for plaintiff.

Crawford C. Martin, Atty. Gen., James C. McCoy and Pat Bailey, Asst. Attys. Gen., Austin, Tex., Henry Harbour, Longview, Tex., Harold Nix, Daingerfield, Tex., Hugh D. Reed, Jr., Fairfield, Tex., J. B. Sallas, Crockett, Tex., Eugene M. McElyea, Bryan, Tex., for defendants.

## SUPPLEMENTAL MEMORANDUM OPINION

JUSTICE, District Judge.

A Memorandum Opinion in this case was issued on December 4, 1970, 321 F. Supp. 1043, and dealt primarily with the legal basis for this Court's action in its

Order of November 24, 1970.[1] Among other things, that Order directed the

[D]efendant school districts, their superintendents, the county boards of education, and county superintendents [to] collaborate with the defendant Texas Education Agency and the Office of Education of the Department of Health, Education and Welfare in the preparation of desegregation plans which shall insure that no child will be effectively denied equal educational opportunities on account of race, color or national origin. * * *

In addition, the Texas Education Agency (hereinafter sometimes referred to as TEA), its officers and others were directed to

[R]e-evaluate all of their activities and practices relating to the desegregation of public elementary and secondary education within the state of Texas * * [and] to file with this court a plan stating specific action which the defendant State Agency may take pursuant to its affirmative obligations under Title VI and the Fourteenth Amendment to (*inter alia*)

(1) Change or modify present administrative practices or policies * * * (and)

(2) Employ * * * sanctions * * * to enforce federal constitutional and statutory standards * *.

The defendants complied with these directives, and numerous plans and proposals were submitted to this Court for the desegregation of the three school districts still remaining in existence as all-black administrative units at the time of the issuance of the November 24, 1970, Order. Brief status reports were also filed concerning the six other all-black districts involved in this case which had been annexed to adjacent school districts *during the pendency of the proceedings*. In addition, the Texas Education Agency submitted a plan regarding its future actions to eliminate from public elementary

and secondary education in Texas all vestiges of segregation based on race, color, or national origin. The United States filed an extensive response to this plan.

It then remained for the Court to issue a decree to desegregate the nine all-black school districts and to order into effect a plan under which the State of Texas, through its appropriate education agencies at the state, county and local levels, will be required to fulfill its concurrent responsibility with that of the Federal government to eliminate the dual school system and to assure that no child in the State is effectively excluded from any school on the ground of race, color, or national origin. Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); and Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L. Ed.2d 554 (1971).

The Court has chosen to issue two orders at this time, the first directed at the desegregation of the various all-black school district, and the second concerning the future actions of the State and its educational agencies. This Opinion is intended to clarify both of these Orders and to explain to some extent the Court's reasoning on a number of difficult issues which arose in the course of its consideration of the case.

### I.

The Court will first address itself to the Order of April 19, 1971, dealing with the desegregation of the all-black school districts. As indicated in the Conclusions of Law and the Order of November 24, 1970, and in the December 4, 1970, Opinion, this Court believes that:

Separate neighboring or overlapping school districts, one black and the other white, are unconstitutional when created and maintained to perpetuate

---

1. This case was styled United States v. State of Texas, et al., C.A. 1424 (Marshall Division) until March 9, 1971, at

which time it was transferred to the Tyler Division and styled C.A. 5281.

a dual school system, and such districts require consolidation with nearby units so as to assure their students equal educational opportunities. Haney v. County Board of Education of Sevier County, Arkansas, 410 F.2d 920 (8th Cir. 1969); United States v. Bright Star School District #6, No. T–69–C–24 (W.D.Ark. April 15, 1970); · Turner v. Warren County Board of Education, 313 F.Supp. 380 (E.D.N.C.1970), affirmed sub nom. Turner v. Littleton-Lake Gaston School District, 442 F.2d 584 (4th Cir. March 23, 1971).

The Court further believes that:

Actions of the State or any of its agencies or officials resulting in the creation, operation, support and general supervision of small school districts whose school facilities are attended exclusively or almost exclusively by members of one race and whose existence cannot be rationalized upon sound educational grounds are unconstitutional in that they result in the denial to students of equal educational opportunities. Turner v. Warren County Board of Education, *supra*.

■ Accordingly, the Court has determined that the law requires that each of the all-black school districts involved in this case be annexed to or consolidated with a nearby unit with bi-racial enrollment in order to achieve meaningful desegregation and to create, at the same time, a stable, administratively and educationally sound school district.

Little explanation is needed concerning the portion of the Order requiring the appropriate county boards of education to annex the Butler and Cason Independent School Districts to the Fairfield and Daingerfield Independent School Districts respectively. The county boards of education are empowered to take such action under Texas law, Texas Education Code (1969) Section 19.001, V.T.C.A. Moreover, in light of the record showing, among other things, the proximity of the two districts involved in each instance, as well as the previous actions involving territorial gerrymanders and student transfers which contributed to the creation and perpetuation of Butler and Cason as all-black districts, these orders of annexation seem amply justified. Moreover, the United States Office of Education and the State, through the Texas Education Agency, concur in the recommendation that these annexations constitute virtually the only solutions to the problem of eliminating Butler and Cason as segregated school districts.

Because of the location of the all-black St. Paul-Shiloh Common School District and the high percentage of minority students residing in the adjacent districts within or partly within Leon County, the elimination of St. Paul-Shiloh as an all-black entity presented more difficulties than did the elimination of Butler and Cason. The inherent complexity of this situation was further reinforced by the fact that the Office of Education filed numerous proposals with the Court designed to desegregate St. Paul-Shiloh, all of which would have eliminated the district and hence have achieved some desegregation. The Court's task, therefore, was to determine the solution which would, in the words of the Supreme Court, "achieve the greatest amount of actual desegregation," Swann v. Charlotte-Mecklenburg, *supra*, and which would, thereby, insure the provision of equal educational opportunities to all of the children in the area as required by the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964. See first Opinion issued in this case, 321 F.Supp. 1043 (E.D.Tex.1970).

In addition, the Court believed that if a proper solution to the elimination of the all-black districts could be found consistent with State law, such a solution should be given preference to one requiring a Federal Court to override state law, provided no substantial reduction of desegregation would result. Accordingly, in attemping to reach an equitable solution to the elimination of St. Paul-Shiloh as an all-black district, the Court determined to seek the "greatest amount of actual desegregation," if possible,

within the limits of State law, but in no event to create a school district which was more than 66% black.

■ In this connection, the Court, in line with its initial Order in this case dated November 24, 1970, believes that a district which is created and maintained with a 66% or higher minority group student body must be considered a minority school district, and that the existence of such a unit creates a strong presumption that the educational opportunities provided to these minority students are inherently unequal to the offerings of nearby districts whose student bodies are more racially or ethnically mixed. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*); Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*); Haney v. County Board of Education of Sevier County, *supra*; Turner v. Warren, *supra*. The same premise might reasonably be applied in defining a segregated, minority school or school bus, although the presumption of unlawful action may lessen somewhat in the latter case, particularly in districts which are transporting students in accordance with Federally approved desegregation plans. Moreover, where state action or inaction of any kind may be shown to have contributed to the creation, operation or perpetuation of a racially isolated district as described above, it may be said that the district is part of an unconstitutional structure based on the provision of separate education for minority children. Griffin v. State Board of Education, 296 F.Supp. 1178 (E.D.Va.1969) (3-judge court). See also Conclusion of Law, number 7, in this case, issued November 24, 1970.

A study of the alternatives proposed by the Office of Education as well as the recommendations of the Texas Education Agency reveals that the easiest solution to the elimination of the St. Paul-Shiloh School District would be to order the annexation of this all-black unit to the Oakwood Independent School District which is located in Leon and Freestone Counties, and adjacent to St. Paul-Shiloh to the north on a direct highway. Oakwood's school facilities are more than ample to accommodate the approximately 90 children from the all-black district and are located only about sixteen miles from the St. Paul-Shiloh community. Such an arrangement, however, would increase the minority percentage of the Oakwood district—already over 50% to 66%, the percentage previously determined by this Court to affect adversely the educational opportunities offered by the district. With this in mind, the Court continued to explore each alternative, weighing the practicalities such as distance and school capacities against the amount of additional desegregation which would be achieved.

The second most logical solution to the problem lay in ordering the annexation of St. Paul-Shiloh to the Centerville Independent School District which is located in Leon County adjacent to St. Paul-Shiloh to the south and southwest. While this solution again would have required only one annexation action by the county board of education and would have reduced the minority percentage in the combined district from 66% to approximately 59%, the children from the St. Paul-Shiloh area would have had to travel a minimum of 30 miles to reach the Centerville schools.[2] Although the distance in itself would not have been prohibitive, Swann v. Charlotte-Mecklenburg, *supra*, the Court believed that unless such an arrangement would result in a substantial increase in the amount of desegregation over that obtainable under other plans, and unless there were no other equally effective alternatives, such an annexation should not be ordered.

Each of the remaining alternatives presented by the Office of Education at the hearing on February 3 and 4, 1971,

2. Testimony showed that this distance would increase substantially if measured from the northern rather than the southern half of the St. Paul-Shiloh District.

would have resulted in desegregation of St. Paul-Shiloh. All of these proposals, however, presented one major flaw; to accomplish the redistricting recommended, it would have been necessary for the Court to act in contravention of State law which prohibits county boards of education from detaching portions of school districts without the approval of a majority of the qualified voters residing in the territory to be detached. Thus, the division of St. Paul-Shiloh or of Lone Star without such approval would have been illegal under Texas law. Texas Education Code (1969), Section 19.261.[3]

The Court gave long and careful consideration to these proposals, particularly in light of the obvious advantages to be gained in the form of increased desegregation and increased educational benefits deriving from enlarging the school districts in question. Moreover, the Court was mindful that as a matter of law, adherence to the requirements of the Federal Constitution and a Federal statute would justify overriding state law if no other satisfactory solution were readily available. The Court, therefore, turned to consideration of other alternatives.

The Court did not look with favor upon the possibility of annexing both St. Paul-Shiloh and Oakwood to the Tucker Independent School District in Anderson County across the Trinity River. The solution would have required most of the St. Paul-Shiloh children to travel about 60 miles a day to attend the Tucker Schools. Both the Texas Education Agency and the Office of Education were unenthusiastic about the educational value of this proposal, and, consequently, the Court felt compelled to reject it. Likewise, the Court considered and subsequently rejected the possibility of annexing both Oakwood and St. Paul-Shiloh to the Buffalo Independent School District which lies adjacent to Oakwood in Leon and Freestone Counties. Under the arrangement, the St. Paul-Shiloh children would again have had to travel about 60 miles a day. Moreover, there was testimony which tended to show that Buffalo's classroom capacity would not have been sufficient to house the additional 350 children.

The final alternative proposed by the Office of Education provided for the annexation of St. Paul-Shiloh to Oakwood, as in alternative 1. In order, however, to counter the increase of black students which, as noted above, would have rendered the combined district approximately 66% black, the Office of Education suggested the additional annexation to Oakwood of the Lone Star Rural High School District with its student body of approximately 89 scholastics, approximately 60% of whom were white. This annexation would bring the combined district to barely 56% black. It was also suggested that a group of about 42 white children living at the Pleasant Hill Children's Home at the southern edge of the Fairfield Independent School District and bordering Oakwood on the north, be transferred to Oakwood. This action would have brought the Oakwood-St. Paul-Shiloh-Lone Star District to about 54% black.

The annexation of Lone Star appeared reasonable in that the district, while not directly adjacent to Oakwood or St. Paul-Shiloh, is separated from it by only a narrow finger of land. Lone Star operates only an elementary school, and its high school students must, even now, transfer elsewhere. The record shows that at least one child living in the strip between Lone Star and Oakwood is presently enrolled in Oakwood, and that at various times during the past few years a number of Lone Star students, particularly some of those in the high school grades, have attended school in Oakwood. The distance between most of Lone Star and the Oakwood schools is less than twenty miles, and since the district is entirely rural, virtually all of its students, even at the elementary level, are presently transported to school.

3. Likewise, the detachment of portions of Buffalo and/or Centerville would not have been consistent with state law absent the approval of the districts involved.

It is apparent from testimony that popular opinion in Lone Star would not support annexation to Oakwood. The Lone Star District, however, is too small under any educational standards available to the Court, including the Report of the Texas Governor's Committee, Volume IV (Government Exhibit 101 A (4)) to allow for the provision of quality education except at exorbitant cost to the taxpayers,[4] and the annexation to Oakwood could be ordered under Texas law, regardless of the lack of contiguity of the two districts. Texas Education Code (1969), Section 19.001; 51 Tex.Jur. 2d Rev. (Part 1), Schools, Section 25. The annexation of Lone Star to Oakwood would substantially increase desegregation in the Oakwood-St. Paul-Shiloh District and clearly would benefit the elementary students from Lone Star by enlarging their scope of contact with other children and by providing for continuity in the flow of their education from grade 1 through grade 12. There was no showing that the assignment of Lone Star's high school students to Oakwood would have a substantial adverse effect on their education. Moreover, as has been established by the Supreme Court, community hostility to desegregation may not be permitted to interfere with the vindication of the constitutional right of children to receive equal educational opportunities. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

Having considered this alternative in light of the goal to be achieved and in view of the other facts already mentioned, the Court has concluded that the annexation of St. Paul-Shiloh and Lone Star to Oakwood would constitute the most realistic way in which to secure meaningful and stable desegregation for the children in the districts affected. The only question remaining was whether or not to require in addition, the transfer to Oakwood of the 42 white children living at the Pleasant Hill Children's Home. As noted above, this Court remains undeterred by the opposition of popular opinion, and it is not mere community hostility, therefore, which has guided the Court in its decision. Unless substantial gains in desegregation were to be made, the Court felt that it should avoid change and disruption for orphaned and neglected, dependent children whose sense of security may depend largely on the constancy of their daily and, hence, of their academic environment. In this situation, were the orphan children to be transferred to Oakwood, the combined district including both Lone Star and St. Paul-Shiloh would remain over 50% black, and the overall percentage of black students would be reduced by only about 2% by the transfer of the orphans. In addition, the percentage of white children in the Fairfield District where the orphans are now enrolled would drop to just over 50%. Thus, the Court has concluded that the transfer action would not substantially benefit desegregation and, in light of the special condition of the orphan children, the Court has decided against ordering them transferred at the present time.

II.

The second Order issued by the Court, dated April 20, 1971, deals with the actions to be required of the State of Texas through its educational agencies at the state, county and local levels to eliminate all vestiges of discrimination from public school education within the State and to promote through affirmative action consistent with the spirit of Green v. County School Board of New Kent County, *supra*, the provision of equal educational opportunities to all children in compliance with Federal constitutional and statutory requirements.

In its Memorandum Opinion of December 4, 1970, the Court stated that "the policies and practices of TEA in administering the public school system in Texas have frequently—whether inadvertently or by design—encouraged or resulted in the continuation of vestiges of racially segregated public education within

---

4. See also Conclusion of Law 15 issued in this case, November 24, 1970.

the State." 321 F.Supp. 1043 (E.D.Tex. 1970). The impetus for the scope of this portion of the Order, therefore, came largely from the Court's belief that the all-black school districts involved in this case could not have operated without state support and that, as a consequence, it would be advisable to delineate for the State with some care how to avoid such deprivations of constitutional rights in the future. As the Supreme Court stated in Swann v. Charlotte-Mecklenburg, *supra*:

> The problems encountered by the district courts and courts of appeals make plain that we should now try to amplify guidelines, however incomplete or imperfect, for the assistance of school authorities and courts. (footnote omitted). (402 U.S. page 14, 91 S.Ct. page 1275).

The court further believes that its entire concept of appropriate relief in this case is consistent with the Supreme Court's opinion in *Swann*. As the high court declared:

> The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation. Segregation was the evil struck down by *Brown I* as contrary to the equal protection guarantees of the Constitution. That was the violation sought to be corrected by the remedial measures of Brown II. That was the basis for the holding in *Green* that school authorities are 'clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.' 391 U.S., at 437–438 [88 S.Ct., at 1694].

> If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

\* \* \* \* \* \*

In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation.

Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults. Swann v. Charlotte-Mecklenburg Board of Education, 16, 91 S.Ct. 1276 (1971).

It is, of course, well to note that in a case such as the one at bar "local authority" must be read as referring to state as well as to county and local officials and administrative bodies, since the constitutional deprivations found in this case resulted from "defaults" at all levels of the state educational system. Finally, however, the Supreme Court noted "the basis of \* \* \* (any) decision (involving the remedy for state-imposed segregation) must be the prohibition of the Fourteenth Amendment that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' " Swann, *supra*, at 18, 91 S.Ct. at 1277.

In accordance with the above reasoning, the Texas Education Agency was directed, under the November 24, 1970, Order, to develop a plan outlining future action to be taken by the state to accomplish this purpose. The Agency submitted such a plan prior to the hearing on February 1 and 2, and the United States filed a Response in which it pointed out possible ways to develop and refine proposals made by the State and offered a number of proposals of its own.

Specifically, the April 20, 1971, Order covers some of the most important areas in which affirmative state action could obliterate remaining vestiges of the dual school system and prevent their recurrence. These areas include student transfers, changes in school district boundaries, school transportation, extracurricu-

lar activities, faculty and staff practices, student assignment, curriculum and compensatory education. In each area, the Court has attempted to combine the proposals submitted by the State and those contained in the Government's Response in light of the legal principles which this Court believes to be prevailing.

The background and legal basis for each area covered by the Order appears to be as follows:

### 1. *Student Transfers*

Under present practice, TEA does not exercise direct control over regular student transfers between districts. Such transfers are arranged pursuant to parental request to the receiving district's superintendent but without the permission or approval of the home district or TEA. Art. 2696a, Vernon's Texas Rev. Civil Statutes (1969). These transfers, once reported to TEA, entitle the receiving district to the state *per capita* and average daily attendance funds earned during the prior school year by the transferring student.

The TEA's present practice is to advise school districts of the HEW policy that:

\* \* \* School systems are responsible for assuring that no arrangement is made nor permission granted for students residing in one school system to attend school in another school system in any case where the result tends to maintain what is essentially a dual structure in either system.

The guiding principle in this Circuit relating to student transfers supports the HEW policy statement. The Fifth Circuit declared in Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211, 1218 (5th Cir. 1969):

The school district shall permit a student attending a school in which his race is in the majority to choose to attend another school, where space is available, and where his race is in the minority.

\* \* \* \* \* \*

If the school district grants transfers to students living in the district for their attendance at public schools outside the district, or if it permits transfers into the district of students who live outside the district, it shall do so on a nondiscriminatory basis, except that it shall not consent to transfers where the cumulative effect will reduce desegregation in either district or reenforce the dual school system.

Accordingly, in line with this decision and consistent with the provisions in the TEA plan relating to student transfers, the Court believes it to be essential that the State Agency review all student transfer requests and that it refuse to approve or support any such requests the cumulative effect of which, in terms of the Order in this case, "will reduce or impede desegregation, or which will reenforce, renew or encourage the continuation of acts and practices resulting in discriminatory treatment of students on the ground of race, color, or national origin."

### 2. *Changes in School District Boundaries*

Under Texas law, school districts may be consolidated pursuant to the approval of the majority of the qualified voters in each district. Texas Education Code (1969), Sections 19.231 *et seq.* In addition to consolidation of districts, school district boundary lines may be altered by annexation or detachment of territory with the consent of the voters residing in the area affected, Texas Education Code (1969), Section 19.261 *et seq.*, and, under certain conditions, a county board of education may annex one school district to another, whether or not such action is requested or approved by the voters residing in the district to be annexed. Texas Education Code (1969), Section 19.001. Annexations and detachments of territory may be appealed to TEA by residents or school districts involved. Texas Education Code (1969), Section 11.13.

The State Agency asserts in its plan that it has no knowledge of any prior consolidation of school districts

where the intent was to reduce or impede desegregation or which renewed or encouraged the continuation of acts and practices resulting in discriminatory treatment of students on the ground of race, color, or national origin.

The State also maintains that it has no authority under Texas law to challenge the validity of any consolidation or closing of any public school. Texas Education Code (1969), Section 11.14. Consequently, the State declined in its plan to take direct action to prevent consolidations which may result in deterring desegregation, although it has agreed to adjudicate complaints involving detachment or annexation if and when such complaints are received by the Agency.

■ The State's position is unacceptable to the Court insofar as it fails to recognize its affirmative obligation to eliminate discrimination "root and branch," Green, supra, and relies instead upon the manifestation of intent in determining where it will fulfill its duty—existing concurrent with that of the Federal Government—to enforce the mandate of Title VI and the Fourteenth Amendment. The existence of unconstitutional discrimination is not determined solely by intent, and the State is prohibited from any act abridging the constitutional rights of children to equal education opportunities whether attempted directly or by evasive schemes. Cooper v. Aaron, supra; Bush v. Orleans Parish School Board, 190 F.Supp. 861 (E.D.La.1960) (3-judge court), aff'd sub nom. City of New Orleans v. Bush, 366 U.S. 212, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961). The Court has, consequently, required that all boundary change proposals be submitted to TEA for approval prior to their going into effect. Any such proposals which appear to violate the Court's Order should be denied approval and should receive no financial support from the State.

3. *Transportation*

The Texas Education Agency currently exercises a large amount of control over school transportation. Texas Education Code (1969), Sections 16.51 *et seq.* Under the Minimum Foundation Program, the State funds a substantial portion of a district's transportation costs. Texas Education Code (1969), Sections 16.56 *et seq.* All buses eligible for state aid must operate on routes approved by the county board and the Commissioner of Education, and the violation of this provision may result in the withholding of transportation funds from the offending County or district. Texas Education Code (1969), Section 16.55. In the event that the offending district receives no Minimum Foundation Program funds,[5] the transportation regulations may be enforced by criminal sanctions. Texas Education Code (1969), Section 4.18.

TEA proposed in its plan that beginning in the 1971–72 school year, it would require districts to report the race of students transported on each route operated for which the district is requesting state transportation funds. The Agency would then order an investigation of "separate" routes prior to September 1 and would refuse to approve a transportation system containing "separate" routes, "if designed to separate Negro and white students," until such routes are changed.

■ The State plan again places emphasis on the intent or "design" demonstrated in the operation of bus routes resulting in the segregation of children on the ground of race, color or national origin. The Court believes that the Agency's reviews of separate bus routes or runs[6] should apply both to separate

---

5. Some districts known as "budget-balance" districts have a large amount of local available funds and do not qualify to receive state aid for salaries and operations or transportation.

6. Since so-called routes often include several trips or runs, the State must be required to examine the runs rather than only the routes. This complete review would enable the State to determine whether a given route includes duplicative runs.

routes or runs resulting from intentional acts to segregate as well as to routes or runs which have the effect of separating children on racial or ethnic grounds if reasonable alternative routes may be developed and adopted by the county or local transportation administrator which will avoid segregation.

The Court again turns to Singleton v. Jackson Municipal Separate School District, *supra*, where the Fifth Circuit declared:

> The transportation system, in those school districts having transportation systems, shall be completely re-examined regularly by the superintendent, his staff and the school board. Bus routes and the assignment of students to busses will be designed to insure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis.

In addition, the United States District Court in United States v. State of Georgia, C.A. No. 12,972 (N.D.Ga., Jan. 13, 1971), stated in a case affecting 81 local districts in the state:

> Bus routes shall be constituted to provide that each bus operated by the district picks up every pupil along the route who is assigned to the school(s) and grade level served by that bus. Where two equally efficient and economical routes are available in a given area of the school district the route which would promote desegregation of buses shall be adopted rather than a route which would maintain segregation.

In this connection, it should also be noted that the *Georgia* order quoted above requires the State Education Agency to review all transportation plans submitted by the affected school districts and to report to the court as to whether these plans satisfy the standards set in the Order. This Court believes that TEA should, similarly, be required to inform local districts of these standards and to review local routes on the basis of these standards.

## 4. Faculty and Staff

Through the Minimum Foundation Program, TEA is responsible for funding a portion of the salary costs of local districts.[7] In order to qualify for salary assistance through the Minimum Foundation Program, the individual district must agree to pay its teachers at least the minimum salary provided for in the Foundation Program's salary scale. In addition, state assistance may not be used to pay teachers who do not meet TEA certification standards for their assignments except under the terms of a temporary certification arrangement based on the non-certified teacher's taking courses or other appropriate action to remove his (or her) deficiency. Texas Education Code (1969), Section 16.31. If the district persists in employing non-certified teachers, it is subject to loss of funds for salaries as well as loss of accreditation. Texas Education Code (1969), Section 16.31.

Current practices regarding the hiring of faculty and staff allow the local districts to contract with such personnel on a term basis. Texas Education Code (1969), Sections 22.09 and 23.28. Teachers may also be hired on a probationary or a continuing contract basis. Texas Education Code (1969), Sections 21.201 *et seq.* When a teacher is dismissed, Texas law provides for a specific hearing and appeal procedure, but if a teacher is dismissed at the end of a contract term or period of probation, the plan submitted to the Court by the State asserts that no appeal is provided by statute.

The TEA plan proposed by the Agency would advise all Texas school districts using the National Teacher Examination or similar tests as criteria for teacher employment that such examinations must be uniformly administered to all appli-

---

7. The portion is determined by the district's economic index which reflects the amount of county and local funds available and the amount of state funds needed to allow the district to meet minimum requirements. The average district in Texas receives about 80% of its financial support from the State.

cants and all employed personnel, without regard to race, color, or national origin. TEA proposed further to refer any complaints relating to faculty discrimination either to the appropriate federal district court if the school district involved is under court order, or to HEW if the district is operating under a voluntary plan approved by that Department.

■ The State plan is unacceptable to the Court insofar as it fails to propose any affirmative action in the area of faculty assignment and in regard to discriminatory practices in faculty hiring, demotions, dismissals and promotions. Once again, the Fifth Circuit case of Singleton v. Jackson Municipal Separate School District, *supra,* sets the standards for all school districts in the Circuit. The Court stated in part:

> [The faculty and staff] who work directly with the children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students * * *. [T]he district shall assign the staff described above so that the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire district. 419 F.2d at 1217–1218.

In addition, *Singleton* established specific standards and procedures for the hiring, firing, demoting or promoting of faculty and staff. Singleton v. Jackson, supra, at pages 1217–1218.

In accordance with the *Singleton* requirements, the Court believes that the TEA should require local educational agencies desiring to receive state funds under the Minimum Foundation Program to include with their preliminary application for such funds a list of objective, non-racial and non-ethnic criteria by which the county or local agency evaluates its faculty and staff.

During the school year, although the State Agency disclaims any direct power over a local district's treatment of its faculty and staff, the Court believes that faculty discrimination may be reduced through special efforts on the part of TEA to notify faculty and staff throughout the State of the availability of complaint procedures and through the careful and expeditious treatment of any such complaints as are received. The Agency should make clear that appeals or complaints need not be limited to dismissals during a contract term, but may also include complaints involving discriminatory practices short of dismissal, such as forced resignations and failures to renew contracts on account of race, color, or national origin of the teacher or staff member. If TEA's examination of complaints reveals violation of the requirements set by this Order and by the Fifth Circuit in *Singleton,* the State is then obligated to take enforcement measures against the offending district and to withhold or withdraw state funds if the district refuses to comply.[8]

5. *Extra-curricular Activities*

The standard required in the Fifth Circuit in the area of extra-curricular activities is generally stated as follows:

> School districts shall conduct all curricular and extra-curricular activities under its control on a non-discriminatory basis. Such activities shall mean any endeavor, other than academic, participated in by pupils or faculty, or staff of the school district in a student or faculty capacity such as athletics, music or any competition meeting or performance involving one or more schools.

8. It should also be noted that if a district is found in noncompliance with Title VI or the Fourteenth Amendment by HEW or by any other agency of the Federal Government, whether executive or judicial, TEA should treat such a finding as conclusive, provided such a finding has been adopted as final agency action by the appropriate executive agency or is not on appeal or eligible for appeal in a judicial proceeding.

See United States v. Georgia, C.A. No. 12972 (N.D.Ga., December 17, 1969); United States v. Jefferson County, 372 F.2d 836 (5th Cir., 1966), aff'd on rehearing, 380 F.2d 385, cert. denied, Caddo Parish School Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). Further, it has recently been held by the District Court in United States v. State of Georgia, *supra*, in a proceeding involving Randolph County, that suspension of programs and activities to avoid operating them on a nondiscriminatory basis is unconstitutional. See also Griffin v. State Board of Education, *supra*.

The State Agency suggested in its plan that accreditation teams be instructed to include in their inspections an examination of extra-curricular activities to determine whether the district being reviewed is operating such programs in compliance with this Order. The Court agrees with the United States as to the basic soundness of this procedure but also concurs with the Government in its proposal that the state staff of the Office of Equal Educational Opportunities known as "Title IV personnel" be required to accompany the accreditation review teams to determine such compliance and to assist and advise in remedying any deficiencies. Further, the State Agency should investigate promptly any complaints of discrimination in this area, and take enforcement action wherever necessary.

### 6. School Curriculum

TEA's present activities in the field of curriculum, according to their plan, consist mainly of consulting services "to assist local school districts in developing meaningful curriculums for desegregated schools." TEA's Accreditation Division routinely examines the curricula in districts under review. Accreditation standards also require a guidance and counseling program.

The TEA proposed to continue to assist local districts through consultative services, to point out deficiencies in course offerings, and to inform districts of differences in such offerings between campuses within districts. The accreditation report sent to the school district would urge implementation of a "comprehensive balanced curriculum on each school campus * * * irrespective of the racial or national origin of the majority of the student body." The Accreditation Division would also emphasize to districts the importance of guidance and counseling, particularly with respect to their efforts to assist minority students.

Although the Agency's plan in this area offers little in the nature of specific course offerings, a well-defined plan in the area of curriculum and other special school programs should be developed, since through expanded curricular offerings, the State may achieve great progress in assuring all children in the State equal educational opportunities. Accordingly, TEA should develop minimum standards aimed at providing equal educational opportunities within local districts in the areas of vocational education, compensatory education for racially or ethnically isolated students, and special programs for children whose primary language is other than English.[9]

The Court believes that the State's consideration of curriculum development should emphasize three major areas:

### a. Vocational Education [10]

In the State Department of Education, there is presently a separate branch under the Assistant Commissioner for Vo-

---

9. Such a requirement finds support in the testimony of Mr. Leon Graham, Assistant Commissioner for Administration, Texas Education Agency, on February 1, 1971. Mr. Graham recognized the educational handicap created by an inadequate knowledge of English and indicated that the State Board of Education has

taken "a very strong stand on bilingual education." (Tr. 71, February 1, 1971)

10. The TEA plan states that "all vocational education student state *associations* sponsored by TEA * * * have been completely desegregated" since 1965. (Plan, p. 6, emphasis added) The Court

cational Education responsible for various aspects of the state vocational education program. These include office education, agriculture education, distributive education, literacy and civil defense education, homemaking education and industrial education. Texas Education Code (1969) Sections 11.41 *et seq.*

TEA should investigate the operation of vocational education programs to determine whether minority children are the victims of employment discrimination. If such barriers exist, the State, through appropriate state agencies, and through local school systems, should take whatever steps are required to insure full participation of minority children in such programs on a nondiscriminatory basis.

b. *Compensatory Education for Minority Children in Racially and Ethnically Isolated Schools.* Curriculum development in this area will not, of course, replace efforts to accomplish full desegregation as required by law. Many urban areas in the process of desegregating, however, may presently have racially or ethnically identifiable schools. In order to afford these students equal educational opportunities, the State must, at least until full desegregation is achieved, develop and implement special curricular and extra-curricular activities, which will compensate to some extent for the inequality in their education resulting from their racial or ethnic separation. United States v. Jefferson County Board of Education, *supra,* 372 F.2d at page 900. In developing curricular and extracurricular activities in this area, the State should examine the programs made available by the Federal government as

well as those currently available or those which could be developed by the State. Every effort should be made by the State Agency to inform local school districts, their officials and their patrons, of the programs available which are, at least in part, financed by the State or the Federal government, and to encourage participation in them.

The State Agency has made its Division of Compensatory Education responsible for overall administration of programs for educationally deprived children under Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. 241a–244 (hereinafter referred to as ESEA). This statute provides a basis for federal assistance to a broad range of activities. Since this aid must be provided in so-called target areas of high concentration of low-income, educationally deprived families, it may well constitute a source of funds for use of school districts in developing special programs for the racially or ethnically isolated children.[11] In addition to the administering of Federal assistance under Title I, the State Agency is also charged with administering Title II of ESEA (School Library Resources), 20 U.S.C. 821–827, and Title III of ESEA (Supplementary Educational Centers and Services), 20 U.S.C. 841–848. These funds could also be used in connection with programs of compensatory education.[12]

c. *Special Educational Programs for Non-English Speaking Students*: Curriculum in this area should be considered as a specialized form of compensatory education. TEA presently offers consultative services to local districts aimed at teaching English for the non-English

---

is concerned primarily with assuring equal opportunities for all students participating in these programs.

11. Activities under Title I could include, for example, remedial programs in which children could participate in special classes run on a bi-racial basis, or field trips on which students from inner-city, racially isolated schools would be joined by children from other areas of the city.

12. Title II funds might be used to provide library materials of special cultural interest to children of minority background. Title III funds could be used to establish centers where children throughout the district could participate together on special projects, remedial activities or extracurricular programs.

speaking student under the Minimum Foundation Program. In addition, the agency administers the distribution of funds under various Federal statutes which may be used to meet the problems of special education for minority children.[13]

Because of the complexity of the problem of curriculum development, the Court believes that the Texas Education Agency should be required, in collaboration with the United States Office of Education (including, but not necessarily limited to, the Title IV staff of that Office) and any other recognized authority on elementary and secondary education, to study this problem in detail and that the State should report to this Court in August, 1971, as to specific courses and programs which it recommends be instituted within the State to improve the educational opportunities afforded minority children and to assist them in closing the gap in their previous cultural and educational background caused by past discrimination.[14] The report developed for the Court should include:

(1) Specific curricula and programs aimed at insuring equal educational opportunities for all students regardless of race, color, or national origin; and

(2) Specific standards for requiring local school districts to participate in these programs and to offer the newly developed curricular offerings, including, for example, State-wide reading and language skills standards under which a school district would be compelled to show that its students meet minimum requirements to be able to participate in appropriate State or Federal

programs to assist it in raising the performance of its students.

### 7. Student Assignment

Little more need be said with regard to the State's obligation to enforce Federal standards in the area of overall student assignment. Clearly, the *Green* and *Alexander* decisions, supra, of the Supreme Court place the burden on school authorities to take affirmative action to convert to a unitary system. Moreover, under the latest Supreme Court decision, in Swann v. Charlotte-Mecklenburg, *supra*, such a unitary system must be one where the "greatest amount of actual desegregation" has been achieved.

Closely related to the problem of student assignment is the problem of segregation of students in or within individual classrooms of a "desegregated" school. Quite clearly, it is unconstitutional to assign students to classrooms on the basis of race, Johnson v. Jackson Parish School Board, 423 F.2d 1055 (5th Cir., 1970); Jackson v. Marvell School District, 425 F.2d 211 (8th Cir., 1970), and it should be equally clear that where the State Agency can determine from complaints, accreditation visits or from any other source, that such discriminatory in-school assignments exist, the Agency should treat such practices as tantamount to discriminatory student assignment to schools and should act accordingly to eliminate such in-school discrimination wherever it is found.

It would seem feasible, for example, for TEA to review on a routine basis,

---

13. For example, under ESEA, Title VII—20 U.S.C. 880b—Bilingual Education, school districts may receive funds to provide classes in Spanish for minority children to assist them in getting an equal education before they are able to use English well enough to compete with their Anglo classmates. Classes may also be conducted in both Spanish and English so that ethnically integrated classrooms may be made possible. Under 20 U.S.C. 241c

(a) (6), 241e(c)—Aid to Children of Migratory Workers—districts may receive Federal aid to assist in the instruction of children migrants, most of whom are Mexican-American and most of whom are deficient in English.

14. Presently within TEA is the Division of Program Development which is to provide state-wide leadership for stimulation, initiation planning and coordination or curriculum improvement programs.

in conjunction with accreditation reviews, a school district's classroom assignments.[15] In addition, the Agency should, of course, investigate specific complaints in this area through the procedures set up for handling grievances, and appropriate sanctions should be employed where required.

### III.

It has been argued to this Court that an Order such as the one here constitutes a misallocation of responsibility and, perhaps, an abdication on the part of the Federal government of the duties rightfully vested in the United States to enforce Federal constitutional and statutory standards. The Court, however, firmly believes that the time is long past for permitting the States of this Union to enjoy the benefits of Federal assistance while refusing to accept a concurrent obligation with that of the National government to take affirmative action to insure the protection of constitutional rights and the enforcement of Federal statutes.

The Order of April 20, 1971, does not, therefore, place a new burden of enforcement upon the State. Rather, it constitutes a reminder that the responsibility for achieving and preserving a constitutional system lies at all levels of the governmental structure. Accordingly, all governmental agencies, whether Federal or State, and whether through their executive, judicial or legislative functions, must act, at all times, to guard and secure the rights of all the people—regardless of race, color, or national origin—to enjoy equality and justice under the law.

15. Racially or ethnically isolated classes may be a result of an educationally neutral assignment policy, particularly in school districts with high minority ratios or in urban areas with racially or ethnically isolated communities. When such instances come to the attention of TEA,

however, they should be investigated carefully to determine whether a valid educational justification for the isolation exists or whether the justification offered is merely a subterfuge to conceal discriminatory student assignments.