TEA2, Forest Springs 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00387-CV







Texas Education Agency and Forest Springs Subdivision, Appellants



v.



Goodrich Independent School District, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 92-16640, HONORABLE F. SCOTT McCOWN, JUDGE PRESIDING








 The Commissioner of Education ordered the Forest Springs subdivision detached
from Goodrich Independent School District and annexed to Livingston Independent School
District. Goodrich I.S.D. filed suit in district court seeking judicial review of the Commissioner's
decision. The district court reversed the order and remanded the cause with instructions to the
Commissioner to deny the proposed detachment and annexation. We will reverse the judgment
of the district court and affirm the Commissioner's order.



BACKGROUND


 The Forest Springs subdivision borders on the Goodrich and Livingston school
districts. Twenty white students and two minority students live in Forest Springs, which is
currently within the Goodrich I.S.D. boundary. Thirteen of these students have been attending
Livingston schools without officially transferring to the school district. In 1987, the Texas
Education Agency ("TEA") refused the requests of several Forest Springs students to transfer to
Livingston I.S.D., explaining that the transfers violated Civil Order No. 5281 of the U.S. District
Court of the Eastern District of Texas as modified (the "federal order"). (1) The record is unclear
as to which, if any, of the thirteen Forest Springs students unofficially attending Livingston I.S.D.
were the students whose transfer requests were denied.

 In 1991, after Livingston discovered the students' unofficial attendance and
threatened to charge them tuition, the Forest Springs subdivision sought detachment from
Goodrich and annexation to Livingston. The Livingston I.S.D. Board of Trustees approved
Forest Springs' proposed annexation, but the Goodrich I.S.D. Board of Trustees denied the
detachment request. Forest Springs appealed Goodrich's decision to the Commissioner of
Education. See Tex. Educ. Code Ann. §§ 11.13, 19.022(i) (West 1991). Section 19.022(i)
provides:



If the board of trustees for either affected district disapproves the petition, an
aggrieved party to the proceedings in either district may appeal the board's
decision to the commissioner of education under Section 11.13 of this code. An
appeal under this subsection is de novo. In deciding this appeal, the commissioner
shall consider the educational interests of the students in the affected territory and
the affected districts and the social, economic, and educational effects of the
proposed boundary change. 



Tex. Educ. Code Ann. § 19.022(i) (West 1991). Before the Commissioner's hearing on January
6, 1992, the parties stipulated that the proposed annexation would have "no substantial adverse
educational, social, or economic effects to the students or to the school districts involved in this
dispute," unless the Commissioner found that the annexation violated the federal order. 
Presumably, then, violation of the federal order was the sole educational effect the Commissioner
was to consider.

 With regard to boundary changes, the federal order directs the TEA and the
Commissioner of Education not to:



permit, make arrangements for, approve, acquiesce in, or give support of any kind
to changes in school boundary lineswhether by detachment, annexation, or
consolidation of districts in whole or in partwhich are designed to, or do in fact,
create, maintain, reinforce, renew, or encourage a dual school system based on
race, color, or national origin.



See United States v. Texas, Civil Order No. 5281 (E.D. Tex. July 13, 1971) (reprinted at 447
F.2d 441, 443-44 (5th Cir. 1971), which affirmed with modifications original orders issued in 321
F. Supp. 1043 (E.D. Tex. 1970) and 330 F. Supp. 235 (E.D. Tex. 1971)). In sum, therefore,
the parties stipulated that the Commissioner's sole role was to investigate the effect of the
proposed boundary change on the segregated status of the two school districts to determine if the
annexation would violate the "dual school system" provision of the federal order. (2)

 In support of his decision allowing Forest Springs' detachment and annexation, the
Commissioner made the following findings of fact and conclusions of law:



Findings of Fact


12. [Forest Springs'] detachment from Goodrich I.S.D. will not result in racial
imbalance; however, it does change the majority and minority percentage of
[Goodrich I.S.D.'s] school population, based on average daily attendance,
by more than one percent.


14. There is no evidence that the detachment of Petitioner Forest Springs
Subdivision from Respondent Goodrich I.S.D. is designed to or does in fact,
create, maintain, reinforce, renew, or encourage a dual school system based
on race, color, or national origin.


15. There is no evidence that the annexation of Petitioner Forest Springs
Subdivision from Respondent Livingston I.S.D. is designed to or does in
fact, create, maintain, reinforce, renew, or encourage a dual school system
based on race, color, or national origin.


Conclusions of Law


 2. The change of boundaries resulting from detachment of the affected territory
from Respondent Goodrich I.S.D. and the annexation of Forest Springs
Subdivision, Petitioner, to Livingston I.S.D. does not violate Federal Civil
Action No. 5281.


 3. Detachment of the affected territory from Respondent and annexation of that
territory to Livingston I.S.D. will have no significant adverse educational,
economic, or social effect on the school districts or students involved.



The district court reversed the Commissioner's decision and held that, considering all the
evidence, the Commissioner could only have concluded that Forest Springs' detachment and
annexation would foster a segregated system of education. 



 THE ISSUE


 Although the parties have defined their dispute in terms of violation of the federal
order, this Court does not sit to interpret and collaterally enforce a federal order. See Prosper
Indep. Sch. Dist. v. Central Educ. Agency, 798 S.W.2d 661, 665 (Tex. App.--Austin 1990, writ
denied). Instead, our review is governed by section 2001.174(2)(E) of the Administrative
Procedure Act ("APA"), under which we review for substantial evidence questions committed to
the agency's discretion and challenged by the parties on appeal. See Tex. Gov't Code Ann. §
2001.174 (West 1995). By stipulation the parties agreed that the creation, maintenance,
reinforcement, renewal, or encouragement of a dual school system in violation of the federal order
was the only educational effect of sufficient gravity to preclude Forest Springs' annexation to
Livingston. Therefore, the issue before us is whether the Commissioner's decision to allow the
annexation of Forest Springs to Livingston I.S.D. is supported by substantial evidence that such
boundary change would not create, maintain, reinforce, renew, or encourage a dual school system
based on race, color, or national origin.



SUBSTANTIAL EVIDENCE REVIEW


 The TEA and Forest Springs allege that because the Commissioner's decision is
supported by substantial evidence, the district court's judgment must be reversed. In conducting
a substantial evidence review, we determine whether the evidence as a whole is such that
reasonable minds could have reached the same conclusion as the agency in the disputed action. 
Texas State Bd. of Dental Examiners v. Sizemore, 759 S.W.2d 114, 116 (Tex. 1988); Texas
Health Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 453 (Tex. 1984). 
We may not substitute our judgment for that of the agency and may only consider the record on
which the agency based its decision. Sizemore, 759 S.W.2d at 116. The appealing party bears
the burden of showing a lack of substantial evidence and cannot meet this burden merely by
showing that the evidence preponderates against the agency decision. Charter Medical, 665
S.W.2d at 452-53. When there is substantial evidence which would support either affirmative or
negative findings, the order will be upheld even though the Commissioner arrived at a decision
contrary to that which the reviewing court might have reached. Auto Convoy Co. v. Railroad
Comm'n, 507 S.W.2d 718, 722 (Tex. 1974).





ANALYSIS
 

 An expert from the TEA, four parents of Forest Springs students, the
superintendents from both the Livingston and Goodrich school districts, and a principal and
teacher from Goodrich testified at the Commissioner's hearing. Dr. Robert Alexius, executive
assistant to the Deputy Commissioner for Accountability at the TEA, investigated the proposed
boundary change. Alexius emphasized at the hearing that he merely provides the Commissioner
with numerical data regarding the racial composition of the affected schools and the anticipated
racial change in the districts. Alexius testified that Goodrich I.S.D. would be 60.1% white if all
children from Forest Springs were properly enrolled in Goodrich I.S.D. Livingston I.S.D. is
80% white. Alexius concluded that if Forest Springs' annexation were allowed, the white student
population in Goodrich I.S.D. would decrease by 2.5 percent.

 Alexius also explained that the TEA uses the federal order's one-percent transfer
rule as a guideline in approving proposed boundary changes and that a boundary change which
results in a one-percent change in racial composition raises a red flag for possible violation of the
federal order. However, he stressed that these statistics were only one factor in the
Commissioner's analysis of whether the proposed change would violate the federal modified
order.

 Both parties spent a significant amount of time in their briefs and at oral argument
discussing the one-percent transfer rule. However, under the terms of the federal order, the one-percent rule applies only to the analysis of transfer requests; the section governing boundary
changes was never amended and does not include a one-percent benchmark. (3) Due to their scope,
boundary changes have broader social, economic, and educational ramifications than individual
student transfers and are poorly suited to determination through application of a rote mathematical
formula. Although we do not pass on the propriety of the TEA's use of the one-percent rule in
analyzing boundary change requests, it appears that the Commissioner, if he considers the one-percent transfer rule in boundary changes at all, should use this quantitative piece of evidence as
only one factor in assaying the broad, qualitative impact of a boundary change.

 Even the federal court that issued the order has noted that the one-percent rule
should not be applied rigidly. In a subsequent modification to its original order, the court stressed
that, regardless of the percentage change in racial composition, the fact that the schools remain
integrated is an important factor in assessing proposed transfer requests. See United States v.
State of Tex., Order Interpreting Modified Order of July 13, 1971 (E.D. Tex. Sept. 8, 1980)
(unpublished). (4) The same holds true in evaluating the segregative effect of a boundary change. 
Evidence was presented that both the Goodrich and Livingston school districts operate as unitary
school systems, (5) are not operating under any court desegregation orders, and enjoy good
interracial relations.

 Regardless of the applicability of the one-percent rule, Goodrich maintains that
Forest Springs' detachment would precipitate defection to Livingston of other white
neighborhoods currently within its boundary. Goodrich presented a significant amount of
evidence that the proposed boundary change would affect it negatively, as witnessed by the
Commissioner's statement that "the evidence presented barely shows . . . that detachment and
annexation is in the best educational as well as the best social interests of the students in the
affected territory." However, some of this evidence related only to economic issues, such as the
district's loss of tax revenues, state funds and resulting budget problems, or the "status" of
Goodrich's students vis-a-vis Livingston's--considerations that did not bear on the narrow "dual
school system" issue the parties contested before the Commissioner and here on appeal. With
regard to the dual school system issue, David Malone, superintendent of the Goodrich school
district, testified that the detachment would have the short-term effect of increasing slightly the
percentage of minority students attending Goodrich I.S.D. However, Malone speculated that if
Holiday Estates and Siesta Country, two other all-white subdivisions bordering on the Livingston
district, were allowed to detach, Goodrich's percentages would change so that black and Hispanic
students would constitute the majority. (6) Based on this potential domino effect, Malone suggested
that the Forest Springs' detachment could encourage a dual school system. Curtis Smith, a
principal in Goodrich I.S.D., and Lorraine Barnes, a fifth grade teacher in Goodrich, also opined
that the detachment would be a step toward re-segregation that could eventually lead Goodrich
back to a dual school system.

 While we sympathize with Goodrich's position, its concern that the other white
subdivisions will follow suit in seeking annexation to Livingston is speculation not supported by
any specific evidence in the record. There is no suggestion that any other subdivision has applied
for detachment from Goodrich I.S.D. Our holding in Prosper is instructive in this regard. In that
case we held that the loss of potential tax revenues based on a detached territory's anticipated
reclassification from agricultural to commercial development land was speculative and reasonably
disregarded by the county commissioners in approving the territory's detachment. Prosper, 798
S.W.2d at 666. We held that the commissioners' decision to give dispositive weight to the
evidence of current tax values was justified and supported by substantial evidence, even though
the future effect of a reclassification could be significant. Id.

 Similarly, Goodrich's evidence that Forest Springs' detachment would precipitate
"white flight" among other subdivisions was so speculative that the Commissioner was not bound
to assign it dispositive weight. Two of the twenty-two children affected by the boundary change
come from minority families, both of which signed the detachment petition. Four Forest Springs
parents, including one black parent, testified at the hearing that the proposed boundary change was
not racially motivated and emphasized that Livingston offered better educational and
extracurricular opportunities for their children. The superintendent of Livingston, Dr. Gerald
Major, supported the parents' position and testified that Livingston schools do not discriminate
on the basis of race, color, or national origin and that he did not approve Forest Springs'
annexation petition on the basis of race. (7) Forest Springs' non-discriminatory intent may be one
factor in the Commissioner's analysis of whether the proposed boundary change violates the dual
school system provision of the federal order. See Price v. Austin Indep. Sch. Dist., 945 F.2d
1307, 1315 (5th Cir. 1991). Even Dr. Alexius, who originally assumed that all of the Forest
Springs students were white, admitted that his perception of the boundary change as white flight
was weakened when informed that two of the students affected by the annexation were minorities. 
While we appreciate Goodrich's concerns over the specter of white flight, we cannot say that the
Commissioner's decision was unreasonable based on the current evidence in this case.



CONCLUSION


 The Commissioner's finding that the proposed boundary change would not create,
maintain, reinforce, renew, or encourage a dual school system based on race, color or national
origin is supported by substantial evidence. Although the boundary change would affect the racial
composition of Goodrich by 2.5 percent, the school would remain integrated and unified. 
Substantial evidence was presented that Livingston offers better educational opportunities and a
wider variety of extracurricular programs than does Goodrich and that these opportunities
motivated Forest Springs to petition for annexation to Livingston. Although Goodrich offered
testimony that Forest Springs' detachment constitutes a harbinger of future detachments that will
result in resegregation, this evidence was speculative and inconclusive. Because the evidence
supports the positions of both Goodrich and Forest Springs, we must uphold the Commissioner's
decision. See Auto Convoy Co., 507 S.W.2d at 722. We sustain TEA and Forest Springs' first
point of error.

 Due to our disposition of the first point of error, we need not address TEA and
Forest Springs' remaining points of error. We reverse the judgment of the trial court and render
judgment that the Commissioner's decision be affirmed.



 

 Bea Ann Smith, Justice

Before Justices Powers, Jones and B. A. Smith

Reversed and Rendered

Filed: May 17, 1995

Publish

1.   The federal order states that, with regard to student transfers, the TEA and the
Commissioner of Education:


shall not permit, make arrangements for, approve, acquiesce in, or give support
of any kind to student transfers, between school districts, when the cumulative
effect in either the sending or receiving school district will be to reduce or
impede desegregation, or to reinforce, renew, or encourage the continuation of
the acts and practices resulting in discriminatory treatment of students on the
ground of race, color, or national origin.


United States v. Texas, Civil Order No. 5281 (E.D. Tex. July 13, 1971) (reprinted at 447 F.2d
441 (5th Cir. 1971), which affirmed with modifications original orders in 321 F. Supp. 1043
(E.D. Tex. 1970) and 330 F. Supp. 235 (E.D. Tex. 1971)). In 1973 the federal order was
amended to include additional guidelines for the decisions regarding student transfers: 


 (3)(a) Where student transfers between school districts involve ethnic
considerations concerning race, color or national origin of students, only hardship
situations shall be considered . . . .


 (b) In such situations, the [TEA] shall not approve transfers where the effect
of such transfer will change the majority or minority percentage of the school
population, based on average daily attendance in such districts by more than one
percent (1%), in either the home or receiving district or the home or the receiving
school.


* * * *



 (4)(d) The agency will consider as factors relevant to its decision in approving
or disapproving student transfers under this Section: (1) whether the receiving
district or the home district is composed solely of one race or ethnic origin, (2)
whether all the students seeking transfers are of one race or ethnic origin . . . . 


United States v. Texas, Amendments to Modified Order of July 13, 1971 (E.D. Tex. Aug. 9,
1973) (unpublished).
2.   Because Education Code section 19.022(i) mandates that the Commissioner "shall
consider the educational interests of the students in the affected territory and the affected districts
and the social, economic, and educational effects of the proposed boundary change" in deciding
an appeal, we doubt the ability of the parties to waive by stipulation the Commissioner's
consideration of these requirements. See Tex. Educ. Code Ann. § 19.022(i) (West 1991)
(emphasis added). However, the Commissioner specifically concluded that these requirements
were satisfied, and neither party has attacked this conclusion on appeal. Moreover, although
Goodrich attempted to withdraw its stipulation after the hearing before the Commissioner, it did
not assign error by cross-point to the district court's affirmance of the Commissioner's refusal to
allow the withdrawal.
3. [3]  Moreover, federal courts have held that, even when applied to transfers, the one-percent rule
is properly used only as a guideline. See Lee v. Eufaula City Bd. of Educ., 573 F.2d 229, 232
(5th Cir. 1978) (holding that "in measuring the cumulative effect of a student transfer program
on desegregation, the Court must do so from a qualitative viewpoint, without blind deference to
a mathematical formula"). 
4.   In this unpublished case, which the parties relied on in construing the federal order below
and which comes to us as part of the transcript, eight black and two white high school students
who lived in Richards Independent School District but had attended school in Huntsville applied
for a transfer to Huntsville I.S.D. schools. Richards was a small school district with 70% white
students. Huntsville was a large school district with a 65% white population. The students
transferring to Huntsville changed the racial balance of Richards by seven percent. In approving
the transfers, the court emphasized that, regardless of the seven-percent change in racial
composition, the Richards school district would remain integrated and that black and white
students would continue to attend the same school. 
5.   A "unitary" school system has completely remedied all vestiges of past discrimination. 
See Price v. Austin Indep. Sch. Dist., 945 F.2d 1307, 1314 (5th Cir. 1991).
6.   Goodrich North, another all-white subdivision, apparently does not share a common
border with Livingston. See Tex. Educ. Code Ann. §19.022(a) (West 1991) (requiring that the
detached territory seeking annexation be contiguous to the school district). 
7. [7]  Major admitted, however, that Livingston has received complaints about the recruiting and
hiring of minority teachers and that Livingston is involved in an ongoing investigation and civil
lawsuit initiated by the NAACP.